**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

**International Alliance of Theatrical & Stage Employees, Petitioner– Intervenor,**

v.

**COMPACT VIDEO SERVICES, INC., Respondent.**

No. 96–70148.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 4, 1997.

Decided July 29, 1997.

David A. Fleischer, National Labor Relations Board, Washington, DC, for petitioner.

Richard W. Kopenhefer, Loeb & Loeb, LLP, Los Angeles, CA, for respondent.

Ira L. Gottlieb, Geffner & Bush, Burbank, CA, for intervenor.

Before: BROWNING, FLETCHER and KOZINSKI, Circuit Judges.

PER CURIAM:

The National Labor Relations Board (NLRB or Board) requests enforcement of its order holding Compact Video Services, Inc. (CVS) violated § 8(a)(1) and (5) of the National Labor Relations Act (NLRA)[1] by failing to give the International Alliance of Theatrical & Stage Employees (Union) pre-implementation notice of the sale of CVS's business or a meaningful opportunity to bargain over the effects of the sale on Union members, and ordering CVS to pay a back-pay remedy and to provide the Union with all contracts relating to the sale without precondition. We grant the Board's request for enforcement.

## I. Factual Background

Security Pacific Bank (Security) and Equitable Life Assurance Society (Equitable) financed a leveraged buyout of Compact Video Group's (CVG) predecessor. CVS is one of three subsidiaries of CVG. CVS and the Union entered into a labor agreement effective August 1, 1992 to July 31, 1996.

By the end of January 1993, CVG was in breach of virtually all of its financial obligations under its loan agreement with Security. For several months, CVG delayed making payments to suppliers of video and film stock and processing equipment. In early July 1993, Security called in the loan to CVG and advised it that it would cancel its revolving credit line as of July 30. By mid-July, after retaining checks from two of its customers rather than forwarding them to Security as required under the terms of its loan, CVG only had enough cash to cover its payroll and tax payments through the end of July and the costs of filing for bankruptcy.

Steinhart Management Company (Steinhart)[2] decided to purchase CVG on or about July 22, 1993, and negotiated with Security and Equitable concerning the sale of CVG.

On July 22, 1993, a Steinhart representative requested that CVG place employment solicitations in two Los Angeles entertainment industry journals, which indicated that CVG was accepting applications for a new state of the art video services company which was presently forming, pending acquisition of Compact Video Services, Inc., and two other CVG subsidiaries on or about August 2, 1993. The ads began to appear on July 26th.

CVS admits that "[u]nion officials did not receive any 'formal' notice directly from CVS prior to the sale to ATS." However, on July 27th, a union field representative sent Union International Representative Leslie Blanchard a copy of the ads by fax. Blanchard called CVS's Human Resources Manager Kristi Kleckner on July 27th. Kleckner confirmed the particulars of the ads and indicated she knew only what was contained in the ads.

Blanchard tried to reach CVG President John Donlon[3] by telephone. While Donlon admitted he was informed that Blanchard had tried to call him, Donlon did not return Blanchard's calls.

In a letter dated July 29th, Blanchard asked Donlon whether the acquisition of CVS was being contemplated now or could be expected in the near future. Blanchard indicated that, if so, the Union demanded "effects" bargaining over the transaction. Blanchard requested that Donlon call him in response to the letter by July 30, 1993. Blanchard sent this letter by registered mail, fax and by hand delivery. Donlon did not respond.

On July 30, 1993, CVS's employees received letters from CVG and ATS informing them of the intended sale of CVG. The letters indicated an agreement had been reached in principle to sell the assets of the Compact companies to ATS, a corporation created by Steinhart to acquire the assets of CVG and its subsidiaries. The sale was expected to close the week of August 2, 1993.

---

1. 29 U.S.C. § 158(a)(5) and (1).

2. Steinhart initially attempted to acquire CVG and a bankrupt competitor, AME, in late 1992; however, this effort was frustrated.

3. Donlon was also CVS's President.

The letters encouraged the current employees to apply to ATS.

Most of CVS's employees received written offers of employment on August 2nd and were hired at a lower pay rate.

On August 2nd, after learning of the July 30th letters, Blanchard went to CVS's Burbank facility. He spoke with Kleckner regarding the acquisition. Kleckner indicated that she did not know the closing date of the sale or the effects of the sale. Kleckner informed Blanchard of CVS's position that the company did not owe severance to employees who accepted employment with ATS and advised him to continue to grieve what was grievable under the Union agreement.

Steinhart ultimately reached agreement with Security and Equitable. On August 3rd or 4th, 1993, the parties executed an agreement whereby ATS acquired CVG and, on August 5th, ATS assumed control of CVG's former operations and dismissed CVG's employees. CVG's officers or representatives did not play a role in the negotiations. Equitable was given authority to make a deal on CVG's behalf.

ATS refused the Union's demands for recognition as representative of the employees doing work formerly done by employees of CVS. Since at least September 1, 1993, CVS has offered to engage in "effects" bargaining. However, CVS has refused to provide the Union with the sales transaction documents and the Union refused to engage in "effects" bargaining without them.

## II. Procedural Background

The NLRB affirmed the administrative law judge's (ALJ) conclusion[4] that CVS had not demonstrated "particularly unusual or emergency circumstances" which would relieve CVS of its obligation under § 8(a)(1)

and (5) of the NLRA to provide the Union with notice of its sale prior to implementation and a meaningful opportunity to bargain over the effects of the sale on Union employees. *See Compact Video Services, Inc.,* 319 N.L.R.B. 131, 131 n. 1 (1995). The Board also found that since the information requested by the Union was relevant to bargaining over the effects of the sale, and CVS had not demonstrated that the information was confidential, CVS violated § 8(a)(1) and (5) of the NLRA by refusing to provide the name and telephone number of the acquiring entity and all contracts relating to the sale. To remedy these violations, the Board ordered CVS to bargain collectively in good faith with the Union upon request, to pay a backpay award and to furnish the Union with all contracts relating to the acquisition without precondition.

## III. Analysis

### A. The Duty to Provide Pre-implementation Notice Absent Unusual or Emergency Circumstances

■ Substantial evidence supports the Board's conclusion that CVS violated § 8(a)(1) and (5) of the NLRA by failing to give the Union pre-implementation notice of the sale of CVS and a reasonable opportunity to bargain regarding the effects of the sale on Union members.

■ An employer must provide express notice of changes in terms and conditions of employment before implementing such changes unilaterally. *See American Distrib. Co. v. NLRB,* 715 F.2d 446, 449–51 (9th Cir.1983) (citing *Stone Boat Yard v. NLRB,* 715 F.2d 441, 444 (9th Cir.1983)).[5] Neither the newspaper advertisements nor the letters to employees were directed to the Union.

---

4. The NLRB noted that it agreed with the ALJ's conclusion that CVS had not demonstrated it had particularly unusual or emergency circumstances which would relieve CVS of its obligation to provide effective notice. Therefore, the Board found it unnecessary to rely on the ALJ's speculative comments "concerning actions the parties to the sale might have taken to accommodate the Union's legitimate interest in preimplementation notice and bargaining." *Compact Video Serv., Inc.,* 319 N.L.R.B. 131, 131 n. 1 (1995). The Board also found it unnecessary to determine the

date on which the duty to provide notice attached. It was sufficient to find that CVS "gave no advance notice of the sale at all." *Id.* (citing *Los Angeles Soap Co.,* 300 N.L.R.B. 289, 289 n. 1 (1990)).

5. Cases cited by CVS holding actual notice is sufficient are in conflict with this circuit's express notice requirement. *See American Distrib.,* 715 F.2d at 451.

*See id.* at 451. Leslie Blanchard's questions to CVS Human Resources Manager Kristi Kleckner indicated substantial confusion on his part and on the part of the Union as to the implications of the advertisements. Despite this confusion, no notice was sent to the Union. CVS President John Donlon was informed of the Union's concerns and questions but failed to notify the Union or respond to the Union's phone calls. No notice at all is necessarily deficient notice.

CVS was not excused from providing pre-implementation notice because of its dire financial circumstances. The NLRB has recognized that unusual or emergency circumstances may relieve an employer of its obligation to provide pre-implementation notice and an opportunity to bargain. The Board has applied this exception only when the circumstances precluded such notice and opportunity to bargain. *See, e.g., Raskin Packing Co.*, 246 N.L.R.B. 78, 78 (1979); *National Terminal Baking Corp.*, 190 N.L.R.B. 465, 465 (1971). CVS's financial crisis did not require immediate implementation of the sale. CVS's financial crisis had been evident for weeks, if not months, before the sale, and the negotiation and implementation of the sale of CVS required several days if not a week. Just as the employer must anticipate various contingencies such as governmental clearances, an employer must allow time to satisfy its obligation to provide pre-implementation notice and effects bargaining. *See Willamette Tug & Barge Co.*, 300 N.L.R.B. 282, 282 (1990). Sufficient time was available to do so after CVS knew of the impending sale.[6]

CVS argues that for practical reasons it was necessary to keep the sale confidential. But as the Board said in *Willamette*, the fact that "circumstances may compel confidentiality in arriving at a sales agreement does not obviate the employer's duty to give pre-implementation notice to the union to allow time for effects bargaining, provision for which may be negotiated in the sales agreement." *Id.* Moreover, CVG's financial problems were no secret. CVG stopped making payments to suppliers for several months and one of its principal customers had exercised its contractual right to audit CVG's finances. In sum, the need for confidentiality did not provide an unusual or emergency circumstance sufficient to relieve CVS of its duty to provide pre-implementation notice or effects bargaining.

Given CVS's notice of the Union's request for effects bargaining, CVS did not fulfill its obligation to give the Union an opportunity to bargain about the effects of the sale. In view of Kleckner's lack of knowledge regarding the sale and its effects on Union employees, and her lack of authority to engage in meaningful effects bargaining, the August 2nd meeting between Blanchard and Kleckner cannot be accurately characterized as effects bargaining. *See S–B Mfg. Co.*, 270 N.L.R.B. 485, 492 (1984) (the employer did not "have someone present who [could] engage in meaningful negotiations" and the negotiators did not have authority to reach a tentative agreement).

## B. The Remedies

The backpay remedy[7] was appropriate to compensate the Union members for

---

**6.** CVS argues that it did not have sufficient control over the terms of the sale to provide the Union with notice and opportunity to bargain. The Union notified CVS that the Union wanted to bargain, but CVS did not respond. CVS cannot assert it was powerless to respond when it made no effort to do so.

**7.** CVS was ordered to pay backpay and interest to the employees terminated on or about August 5, 1993, at the rate they earned on August 4, 1993. The payments were to commence on the sixth day after the decision was entered and were to continue until (1) CVS reaches an agreement with the Union concerning the effects of the sale on the unit employees; (2) CVS and the Union

reach a bona fide impasse in bargaining unrelated to CVS's failure to furnish the information it was ordered to furnish by the decision; (3) the Union within five days of having received the information requested, fails to request bargaining, or the Union fails to commence bargaining within five days of CVS's request for bargaining; or (4) the Union fails to bargain in good faith. The backpay award could not exceed the amount the former employees would have earned as wages from the date CVS terminated them to the date they secured equivalent employment elsewhere or to the date CVS has furnished the information requested and offered to bargain in good faith. The backpay award cannot be less

their financial losses and the loss of the opportunity for meaningful effects bargaining. CVS suggests the Union did not suffer any losses because CVS had nothing to give. However, if bargaining had occurred while CVS was still dependent upon Union employees to continue operating, the Union might have obtained concessions regarding wages, severance pay or other benefits as part of the acquisition, particularly since the purchaser planned to hire most of the employees. *See Live Oak Skilled Care & Manor*, 300 N.L.R.B. 1040, 1042 (1990) (ordering a back-pay remedy because the employees could have obtained additional benefits even though all of the employees were retained and received a raise).

■ The Board properly ordered CVS to provide the Union with contracts relating to the acquisition and takeover. CVS's bare assertion that the sales contract contained confidential information is insufficient to overcome the great weight we must give the Board's finding that the information in the sales contract is relevant. *See NLRB v. Pfizer, Inc.*, 763 F.2d 887, 891 (7th Cir.1985) (holding that an employer's bare assertion that information is confidential does not entitle it to resist production). Since the NLRB has stated that its order does not require CVS to furnish the salaries of non-bargaining unit employees, CVS may redact this information before providing the contracts to the Union.

The order is enforced.

---

than the wages the former employees would have earned for two weeks as CVS employees.

