## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: March 19, 2013                                    Decided: May 6, 2013)

Docket No. 12-2213-cv

———————————————————————————————

BRUCE BERLIN, NANCY BERLIN,

*Plaintiffs-Appellees*,


v.


RENAISSANCE RENTAL PARTNERS, LLC, d/b/a RENAISSANCE
CONDOMINIUM PARTNERS II, LOUIS R. CAPPELLI,

*Defendants-Appellants,*

DELBELLO DONNELLAN WEINGARTEN WISE & WIEDERKEHR, LLP,

*Defendant.*[*]

———————————————————————————————

Before: JACOBS, CABRANES, and STRAUB, *Circuit Judges.*

The question presented in this appeal is whether a single-floor condominium unit in a multi-story building is a "lot," thus triggering the disclosure and reporting requirements of the Interstate Land Sales Full Disclosure Act ("ISLA"), 15 U.S.C. § 1701 *et seq.* The Consumer Financial Protection Bureau ("CFPB") and the Department of Housing and Urban Development ("HUD")—

---

[*] The Clerk of Court is directed to amend the official caption in this case to conform to the listing of the parties above.

the agencies presently and formerly charged, respectively, with administering ILSA—promulgated a rule defining the term "lot" to require the "exclusive use of . . . land," 12 C.F.R. § 1010.1(b), and, in turn, interpreted the term "land" to mean "realty," thus applying ILSA's requirements to condominium units in multi-story buildings. Because "land" can be used as a term of art meaning "realty," we hold that the CFPB and HUD have reasonably interpreted their own definition of the term "lot." The United States District Court for the Southern District of New York (Frederick P. Stamp, Jr., Judge of the United States District Court for the Northern District of West Virginia, sitting by designation) therefore properly granted summary judgment to the plaintiffs. We also hold that the District Court did not err or "abuse its discretion" by awarding attorneys' fees.

Affirmed.

Chief Judge Jacobs dissents in a separate opinion.

> ROBERT HERMANN, DelBello Donnellan Weingarten Wise & Wiederkehr, LLP, White Plains, NY, *for Defendants-Appellants.*
>
> LAWRENCE C. WEINER, Wilentz, Goldman & Spitzer, P.A., Woodbridge, NJ, *for Plaintiffs-Appellees.*
>
> NANDAN M. JOSHI (Meredith Fuchs, General Counsel, To-Quyen Truong, Deputy General Counsel, David Gossett, Assistant General Counsel for Litigation, *on the brief*), Consumer Financial Protection Bureau, Washington, DC, *for the Consumer Financial Protection Bureau, Amicus Curiae in Support of Appellees.*

JOSÉ A. CABRANES, *Circuit Judge*:

The Interstate Land Sales Full Disclosure Act ("ISLA"), 15 U.S.C. § 1701 *et seq.*, "protects individual buyers or lessees who purchase or lease lots in large, uncompleted housing developments, including condominiums, by mandating that developers make certain disclosures." *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 676 (2d Cir. 2012). The question presented in this appeal is whether a single-floor condominium unit in a multi-story building is a "lot," thus triggering ILSA's

2

protections. *See* 15 U.S.C. § 1703(a)(1) (statutory requirements apply to the "sale or lease of any lot" that is not otherwise exempt).

The Consumer Financial Protection Bureau ("CFPB") and the Department of Housing and Urban Development ("HUD")—the agencies presently and formerly charged, respectively, with administering ILSA[1]—have defined the term "lot" to mean "any portion, piece, division, unit, or undivided interest in land located in any state or foreign country, if the interest includes the right to the exclusive use of a specific portion of the land." 12 C.F.R. § 1010.1(b).[2] As relevant here, the CFPB and HUD have consistently maintained that this definition applies to condominium units, including single-floor units in multi-story buildings. In particular, the CFPB and HUD have interpreted the phrase "exclusive use of . . . land" to mean exclusive use of realty, *see, e.g.*, CFPB Letter Br. at 6, thus concluding that the statutory term "lot" applies to condominiums,[3] because they "carry the indicia of and in fact are real estate," Land Registration, Formal Procedures, and

---

[1] "Following passage of the Dodd-Frank Wall Street Reform and Consumer Protection Act, . . . the rulemaking and other authority historically vested in [the Department of Housing and Urban Development ("HUD")] under the Interstate Land Sales Full Disclosure Act was transferred to the newly created Consumer Financial Protection Bureau." *Bacolitsas*, 702 F.3d at 675–76 n.1.

[2] 12 C.F.R. § 1010.1 was promulgated by the Consumer Financial Protection Bureau in 2011. The provision duplicates the same definition appearing at 24 C.F.R. § 1710.1, promulgated in 1973 by HUD.

[3] We use the term "condominium" to refer to "[a] single real-estate unit in a multi-unit development in which a person has both separate ownership of a unit and a common interest, along with the development's other owners, in the common areas." BLACK'S LAW DICTIONARY 336 (9th ed. 2009); *see also, e.g.*, Michael H. Schill, et al., *The Condominium versus Cooperative Puzzle: An Empirical Analysis of Housing in New York City*, 36 J. LEGAL STUD. 275, 277 (2007) ("The condominium owner owns his or her unit in fee simple absolute and shares an undivided interest in the common elements (for example, sidewalks, hallways, pools, clubhouse, storage place) as a tenant in common with the other condominium owners."). New York law recognizes this form of ownership in the Condominium Act, *see* N.Y. REAL PROP. § 339-d *et seq.*, which provides, in part, that "[e]ach unit, together with its common interest, shall for all purposes constitute real property," *id.* § 339-g, and that "[e]ach unit owner shall be entitled to the exclusive ownership and possession of his unit," *id.* § 339-h. New York law also provides for common ownership, among unit owners, of "[t]he common interest appurtenant to each unit," *id.* § 339-i(2); *see* Gerald Lebovits & James P. Tracy, *Cooperatives and Condominiums in the New York City Housing Court*, 36 N.Y. REAL PROP. L.J. 45, 47 (2008) (summarizing condominium law in New York); *see also* note 6, *post* (discussing the history of condominium law). "Typically, the rules of a condominium association do not restrict to whom an owner may sell his or her apartment, although the association may maintain a seldom used preemptive right of first refusal to purchase the apartment." Schill, *ante*, at 281. By contrast, in the "housing cooperative" form of property ownership, which long antedated condominium law in the United States, *see* note 6, *post*, "the owner of the building . . . is the cooperative corporation," which is owned by shareholder-tenants who obtain leases to their respective apartments, Schill, *ante*, at 277, and who typically must first obtain the approval of the board of directors of the cooperative before being allowed to purchase cooperative shares and to become tenants, *id.* at 282; *see also* Lebovits & Tracy, *ante*, at 45 (summarizing the applicable law regarding cooperatives in New York).

3

Advertising Sales Practices, and Posting of Notice of Suspension, 38 Fed. Reg. 23,866, 23,866 (Sept. 4, 1973).

We hold that the CFPB and HUD have reasonably interpreted their own definition of the term "lot." Accordingly, the United States District Court for the Southern District of New York (Frederick P. Stamp, Jr., Judge of the United States District Court for the Northern District of West Virginia, sitting by designation) properly granted summary judgment to the plaintiffs. We also hold that the District Court did not err or "abuse its discretion" by awarding attorneys' fees.

## BACKGROUND

The facts in this case are straightforward and undisputed. In 2007, plaintiffs-appellants Bruce and Nancy Berlin (jointly, "Berlin") contracted to purchase a condominium unit on the sixteenth floor of The Residence at The Ritz-Carlton, Westchester—a building then under construction in White Plains, New York—from the developer, defendant-appellee Renaissance Rental Partners, LLC, and its principal, defendant-appellee Louis R. Capelli (jointly, "Renaissance"). Two years later, and before title was transferred, Berlin renounced the agreement and demanded a full refund of the $167,625 deposit. Berlin argued that the contract was voidable because Renaissance had not furnished a "printed property report," as required by 15 U.S.C. § 1703(a)(1)(B).[4]

---

[4] As relevant to this case, ILSA provides in 15 U.S.C. § 1703:

**(a) Prohibited activities**

It shall be unlawful for any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce, or of the mails—

**(1)** with respect to the sale or lease of any lot not exempt under section 1702 of this title—

**(A)** to sell or lease any lot unless a statement of record with respect to such lot is in effect in accordance with section 1706 of this title;

**(B)** to sell or lease any lot unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee; . . .

. . .

**(c) Revocation of contract or agreement at option of purchaser or lessee where required property report not supplied**

In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee

4

When Renaissance refused the rescission and denied the refund request, Berlin brought this suit pursuant to 15 U.S.C. § 1709, which provides a right of action "at law or in equity against a developer or agent if the sale or lease was made in violation of section 1703(a) of this title." *Id.* § 1709(a).

Applying principles of agency deference, the District Court granted summary judgment to Berlin in a memorandum decision and order dated April 27, 2012. *See Berlin v. Renaissance Rental Partners, LLC*, 09 Civ. 8477 (FPS), slip op. at 8-12 (S.D.N.Y. Apr. 27, 2012) ("Dist. Ct. Op."). The Court explained that the agency definition of the term "lot" does not reveal "any intention to limit the application of ILSA to 'horizontal' condominiums, and to exclude high-rise or 'vertical' condominiums." *Id.* at 8. Because "'condominiums carry the indicia of and in fact are real estate,'" *id.* at 10 (quoting 38 Fed. Reg. at 23,866), the Court continued, "the proper focus regarding the analysis of whether a unit has exclusive rights to the use of land under 24 C.F.R. § 1710.1 is whether the purchase of the unit gave the purchasers the exclusive right to a unit, or any type of 'realty,'" *id.* (referencing *Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1448 (11th Cir. 1985)). Finally, the Court noted the marked absence of "an opinion by *any* court which has found that ILSA is inapplicable to any type of condominium, much less a high-rise condominium in particular." *Id.* at 14.

Also relevant to this appeal, the District Court's decision and order partially granted Berlin's motion for attorneys' fees by awarding fees incurred "from the date of this Court's memorandum decision and order denying the defendants' motion to dismiss on August 19, 2011 until the date of this memorandum decision and order." *Id.* at 15. In support of its decision to award fees, the

in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

District Court explained that Renaissance's argument that the condominium unit was not a "lot" within the meaning of ILSA "had been all but foreclosed by other case law interpreting ISLA." *Id.*

On appeal, Renaissance asserts that ownership of a condominium unit in a multi-story building does not include the right to "the exclusive use of a specific portion of the land," 12 C.F.R. § 1010.1(b), because the term "land" refers to the "tangible surface of the earth," Appellants' Br. 14. Renaissance also contests the District Court's decision to award attorneys' fees.

After receiving the parties' briefs, we invited the CFPB, which did not participate in the District Court proceedings, to submit a letter brief offering its views. The CFPB responded by letter brief on March 12, 2013, explaining, in part:

> HUD explained when it promulgated the definition of "lot" in 1973 that "condominiums carry the indicia of and in fact are real estate." 1973 Rule, 38 Fed. Reg. at 23866. Accordingly, "the proper focus regarding the analysis of whether a unit has exclusive rights to the use of land under 24 C.F.R. § 1710.1 is whether the purchase of the unit gave the purchasers the exclusive right to a unit, or any type of 'realty.'" [Dist. Ct. Op. at 10.] In that regard, the preamble to the 1973 Rule makes clear that a condominium is "equivalent to a subdivision, *each unit being a lot*." 38 Fed. Reg. at 23866 (emphasis added). Because the condominium unit is itself a lot for purposes of ILSA, a purchaser of the unit need not have a separate interest in "raw land" to be entitled to the protections of ILSA's disclosure and anti-fraud requirements.
>
> . . . As HUD explained in 1973, the "application of [ILSA] to condominiums has been consistent [HUD] policy since the issue was first raised in 1969"—the year that ILSA took effect. 1973 Rule, 38 Fed. Reg. at 23866; *see* ILSA § 1422, 82 Stat. at 599 (effective date provision).[5] HUD consistently reaffirmed that determination in subsequent guidance documents. *See, e.g.*, 40 Fed. Reg. at 47166 ("For jurisdictional purposes, a condominium 'unit' is a 'lot.'"); 1996 Guidance, 61 Fed. Reg. at 13596 (stating that the definition of "lot" applies to the "sale of a condominium or cooperative unit"). . . .
>
> . . .
>
> . . . Appellants argue that the 1973 regulation, by using the term "land," was intended to apply only to condominiums that were "horizontal developments and . . . campgrounds," Br. 7 (quoting 1973 Rule, 38 Fed. Reg. at 23866), and not "condominiums where purchasers have [only] exclusive use of their 'unit,'" *ibid.* That argument is contradicted by contemporaneous HUD statements that

---

[5] In a footnote, the CFPB explained that, "although the term 'land' might refer merely to the 'ground, soil, or earth,' in a legal sense, it 'signifies everything which may be holden,' including 'anything that may be classed as real estate or real property.'" CFPB Letter Br. at 7 n.5 (quoting BLACK'S LAW DICTIONARY 1019 (4th ed. 1968)).

demonstrate its understanding that ILSA applies to multistory condominium developments. In the preamble to the 1973 rule, HUD made clear that ILSA would apply to "condominiums intended as primary residences in metropolitan areas" that did not qualify for the two-year construction exemption. 1973 Rule, 38 Fed. Reg. at 23866. As the district court found, HUD's discussion of condominiums "in metropolitan areas" reflected its view that ILSA's protections extend to purchasers of "high-rise or 'vertical' condominiums." [Dist. Ct. Op. at 8.] Indeed, less than six months after issuing the 1973 Rule, HUD removed any doubt on the matter by issuing guidelines designed to accommodate "the realities of condominium construction, especially *high-rise construction*." 1974 Guidance, 39 Fed. Reg. at 7824 (emphasis added). The 1974 Guidance thus makes clear that the term "lot" is not confined to "horizontal developments" and "campgrounds."

. . . Appellants argue (Br. 13) that the definition of the term "land" used in 24 C.F.R. § 1710.1 is determined by New York state property law, which they claim defines "land" to exclude "structures or improvements constructed on the land." As this Court observed, however, ILSA creates "a *national standard* to guarantee full disclosure for the benefit of prospective buyers." *Bacolitsas*, 702 F.3d at 682 (emphasis added). ILSA's national reach requires that the meaning of the federal regulatory term "land" be determined under federal law.

CFPB Letter Br. at 6–7, 10–11. The CFPB also participated in oral argument.

## DISCUSSION

### A.

The only merits dispute at issue in this appeal is whether a single-floor condominium in a multi-story building "includes the right to the exclusive use of a specific portion of *the land*," 12 C.F.R. § 1010.1(b) (emphasis supplied), thus qualifying as a "lot" within the meaning of ILSA. We review this legal question *de novo*. *See Maslow v. Bd. of Elections in N.Y.C.*, 658 F.3d 291, 295–96 (2d Cir. 2011).

The consistent and longstanding view of the CFPB, HUD, and all courts that have considered this issue is that a single-floor condominium unit in a multi-story building is a "lot" within the meaning of ILSA when ownership of the unit includes the right to exclusive use of the unit. "It is well established that an agency's interpretation need not be the only possible reading of a regulation—or even the best one—to prevail. When an agency interprets its own regulation, the Court, as a general rule, defers to it unless that interpretation is plainly erroneous or inconsistent

7

with the regulation." *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1337 (2013) (internal quotation marks omitted). We conclude that the interpretation by the CFPB and HUD of their own regulation is reasonable and therefore warrants deference.

In common usage, the term "land" brings to mind the surface of the earth. In legal parlance, however, "land" can have a different meaning. The term "land" is sometimes used to mean "[a]n estate or interest in real property," a concept that "'is not restricted to the earth's surface, but extends below and above the surface.'" BLACK'S LAW DICTIONARY 955 (9th ed. 2009) (quoting PETER BUTT, LAND LAW 9 (2d ed. 1988)). Moreover, ownership of "land," in this technical sense, does not require ownership of soil or other physical matter tied to the earth. "'Ultimately, as a juristic concept, "land" is simply an area of three-dimensional space, its position being identified by natural or imaginary points located by reference to the earth's surface.'" *Id.* (quoting the same).

Inasmuch as "land" is sometimes used as a term of art referring to "real estate," the CFPB and HUD have reasonably concluded that their own definition of "lot" applies to a condominium unit in a multi-floor building. Condominium ownership had only emerged in the continental United States in the 1960s,[6] but by the time HUD promulgated its definition of "lot" in 1973, the agency

---

[6] American condominium ownership emerged in Puerto Rico (by way of Cuba) in the 1950s, and quickly spread to the continental United States in the 1960s, following Puerto Rico's successful lobbying efforts to amend the National Housing Act to provide for federal insurance of condominium mortgages. *See* Curtis J. Berger, *Condominium: Shelter on a Statutory Foundation*, 63 COLUM. L. REV. 987, 987–88 & n.4 (1963) (noting the influence of Puerto Rican lobbying); Robert G. Natelson, *Condominiums, Reform, and the Unit Ownership Act*, 58 MONT. L. REV. 495, 502 (1997) (observing that, "[a]lthough antecedents of the condominium concept existed in Medieval times," condominium statutes first appeared in Civil Law countries in the first half of the twentieth century). Largely because of economic advantages associated with condominium ownership, the condominium has become the dominant form of apartment ownership in the United States. Schill, *ante*, note 3, at 275–77. In New York City, however, cooperative apartments, or "co-ops," have existed since the nineteenth century and still make up the vast majority of common-interest apartment buildings, due in part to the exclusivity permitted through ownership by a cooperative corporation that reviews applications of putative co-owners. *Id.* at 275–79, 284–85, 313–14; *see also* note 3, *ante* (summarizing the basic differences between condominiums and housing cooperatives). One of the earliest of these co-ops was the Amalgamated Cooperative Houses in the Kingsbridge Heights neighborhood of the Bronx, built by Sidney Hillman's Amalgamated Clothing Workers Union in the 1920s "to create a community that represented universal humanistic values" with "no single ideology." Christopher John Farah, *For a Working-Class Dream, a New Day*, N.Y. TIMES, May 4, 2003, at Section 14; *see also* RICHARD PLUNZ, A HISTORY OF HOUSING IN NEW YORK CITY 153–55 (1990). Today the world's largest co-op complex, spanning 35 buildings, is Co-op City in the Baychester neighborhood of the Bronx, built by the United Housing Foundation, "a nonprofit membership corporation established for the purpose of aiding and encouraging the creation of adequate, safe and sanitary housing accommodations for wage earners and other persons of low or moderate income." *United Hous.*

was already applying ILSA to sales of condominium units on the basis that those units are real estate. As HUD explained at that time:

> The application of the Act to condominiums has been consistent OILSR[7] policy since the issue was first raised in 1969. The bases for this position are that condominiums carry the indicia of and in fact are real estate, whether or not the units therein have been constructed. A condominium is accordingly viewed by OILSR as equivalent to a subdivision, each unit being a lot. Adverse comment, particularly from builders, asserts that condominiums are equivalent to houses and the sale of houses was not intended to be covered by the Act. However, the right to condominium space is a form of ownership, not a structural description. This condominium concept is employed as an ownership form for completely horizontal developments and even for campgrounds. Congress recognized the need to exempt professional builders from the Act and provided an appropriate exemption [in 15 U.S.C. § 1702(a)(2)]. For a condominium unit sale to be exempted from the Act, it must accordingly qualify for exemption; i.e., either it must be completed before it is sold, or it must be sold under a contract obligating the seller to erect the unit within two years from the date the purchaser signs the contract of sale.

38 Fed. Reg. at 23,866. In other words, a right to exclusive use of a condominium unit is a right to exclusive use of real estate, and therefore a condominium unit—whether in a multi-story building or even in "completely horizontal developments" and "campgrounds"—is a "lot" within the meaning of ILSA.[8]

The relevant agencies—originally HUD and now the CFPB, *see* note 1, *ante*—have consistently maintained this understanding ever since the issue was first raised in 1969. *See, e.g.,* CFPB Letter Br. at 5–13; 61 Fed. Reg. 13,596, 13,602 (1996 HUD Guidance) ("lot" includes "a condominium or cooperative unit"). Congress has at least implicitly recognized that interpretation. *See Winter*, 777 F.2d at 1449 n.12 ("Congress did more than acquiesce in HUD's longstanding

---

*Found., Inc. v. Forman*, 421 U.S. 837, 840–43 (1975) (internal quotation marks omitted); *see also* Christopher Gray, *An Innovation, Packed With Artists*, N.Y. TIMES, Apr. 7, 2013, at RE9 (discussing other cooperatives in New York City); Samuel G. Freeman, *American Radicals as Co-op Housing Pioneers*, N.Y. TIMES, Apr. 26, 2009, at C3 (same).

[7] The Office of Interstate Land Sales Registration (OILSR) was formerly designated by the Secretary of HUD to administer ILSA. *See Winter*, 777 F.2d at 1447 n.9. Congress later transferred that function to the CFPB. *See* note 1, *ante*.

[8] HUD's reference to "completely horizontal developments" does not cast doubt on this conclusion. In context, HUD was simply explaining that ILSA's application to "condominiums" applies *not only* to condominium units in multi-story buildings but also to horizontal developments and even campgrounds. 38 Fed. Reg. at 23,866.

interpretation; Congress took specific action in 1978 to exempt the sale of some condominiums from the Act's scope," implying "that, absent such an exemption, [ILSA] must apply to the sale of condominiums."). And courts, too, "have consistently held that a 'condominium unit' constitutes a 'lot.'" *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 127 F.3d 478, 481 (6th Cir. 1997). Finally, this interpretation accords with the text and purposes of ILSA. As the Court of Appeals for the Eleventh Circuit explained:

> [ILSA] was intended to curb abuses accompanying interstate land sales. The Act accomplishes that goal by including within it all sales of lots and then exempting a number of transactions, including sales of fully improved property. It is reasonable to conclude, as HUD did, that the term "lot" was used to refer generally to interests in realty. The legislative history supports this construction, employing the terms "lot," "land," and "real estate" in discussing the Act. This construction is also reasonable in terms of the purpose of the statute. A fraudulent out-of-state sale of land is not rendered any less fraudulent if the condominium form of ownership is utilized.

*Winter*, 777 F.2d at 1448. For these reasons, we defer to the agency rule defining "lot" and to the consistent and longstanding agency understanding that this rule applies to single-floor condominium units in multi-story buildings when ownership of those units includes the right to exclusive use of those units.[9]

On appeal, Renaissance has not asserted any other defense to Berlin's action to revoke the contract pursuant to 15 U.S.C. § 1703(c), *see* note 4, *ante*, and we therefore affirm the District Court's grant of summary judgment to Berlin.

---

[9] In doing so, we reject Renaissance's argument that the term "land" obtains meaning by reference to state law. A state need not recognize condominium ownership as a matter of state property law, but once a state recognizes that form of property, federal law supplies "a national standard," *Bacolitsas*, 702 F.3d at 682, to determine whether a condominium can be a "lot" within the meaning of ILSA. A contrary conclusion would upset the uniform application of federal law as well as the federal interest in curbing abuses in the sale of real estate. *See, e.g.*, *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("Undoubtedly, federal programs that by their nature are and must be uniform in character throughout the Nation necessitate formulation of controlling federal rules." (internal quotation marks omitted)).

**B.**

Renaissance also argues that the District Court erred or "abused its discretion" by awarding attorneys' fees to Berlin. Before reaching the merits of this claim, however, we must address Berlin's argument that we lack appellate jurisdiction to consider the District Court's fees award because Renaissance filed a premature notice of appeal—after the entry of judgment ordering an award of particular costs and fees, but prior to the District Court's actual calculation of that award amount.[10]

In the circumstances of this case, we have jurisdiction to review the District Court's decision to award fees.[11] It is true that "[a] non-quantified award of attorneys' fees and costs is not appealable until the amount of the fees has been set by the district court," *O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.*, 537 F.3d 153, 167 (2d Cir. 2008), and therefore Renaissance's appeal of the fees award was premature, *see* FED. R. APP. P. 4(a)(1)(A) (period for filing notice of appeal starts *after* entry of appealable order or judgment). Nonetheless, "a premature notice of appeal from a nonfinal order may ripen into a valid notice of appeal if a final judgment has been entered by the time the appeal is heard and the appellee suffers no prejudice." *Houbigant, Inc. v. IMG Fragrance Brands, LLC*, 627 F.3d 497, 498 (2d Cir. 2010) (quotation marks omitted). These two conditions have been met here. Following Renaissance's notice of appeal, the District Court amended the judgment to account for the fees amount, *see* note 10, *ante*, and we detect no prejudice to Berlin. Accordingly, we proceed to the merits of the decision to award fees. *See, e.g., LaForest v. Honeywell Int'l Inc.*, 569 F.3d

---

[10] The District Court first entered judgment on April 30, 2012, awarding Berlin summary judgment on the merits along with an unspecified amount of attorneys' fees. In an Amended Judgment, entered on May 18, 2012, the District Court adjusted the damages award to account for prejudgment interest but still did not specify precise award amounts. Renaissance filed a notice of appeal on May 30, 2012. On June 14, 2012, the District Court issued a Second Amended Judgment awarding Berlin $26,950 in attorneys' fees and $1,194.31 in costs. Renaissance did not file a notice of appeal with respect to this Second Amended Judgment until September 21, 2012, well beyond the 30-day notice period, *see* FED. R. APP. P. 4(a)(1)(A), but, as we explain, the earlier notice of appeal filed on May 30, 2012, ripened upon entry of the final costs order and is therefore valid.

[11] The appellants contest only the District Court's decision to award fees—not its *calculation* of the fees amount. Additionally, the appellees did not file a cross-appeal contesting the District Court's decision to limit fees to those incurred "from the date of [its] memorandum decision and order denying the defendants' motion to dismiss on August 19, 2011 until the date of th[e] memorandum decision and order [granting summary judgment]," Dist. Ct. Op. at 15, and therefore we do not consider that issue.

11

69, 73 (2d Cir. 2009) ("Because there is now an appealable final order regarding fees and costs, that order is ripe for review."); *Iberiabank v. Beneva 41-I, LLC*, 701 F.3d 916, 920–21 n.7 (11th Cir. 2012).[12]

ILSA provides district courts with wide discretion in fashioning a suitable monetary award. According to the statute, "[t]he amount recoverable in a suit authorized by this section may include . . . interest, court costs, and reasonable amounts for attorneys' fees, independent appraisers' fees, and travel to and from the lot." 15 U.S.C. § 1709(c). The statutory authorization that a district court "may" award attorneys' fees "'clearly connotes discretion,'" *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 136 (2005) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994)), and we therefore review a district court's decision whether to award attorneys' fees under ILSA for abuse of discretion, *see Barbour v. City of White Plains*, 700 F.3d 631, 634 (2d Cir. 2012) ("We review a district court's award of attorneys' fees for abuse of discretion."); *see also In re Sims*, 534 F.3d 117, 132 (2d Cir. 2008) (a district court abuses its discretion if it "base[s] its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or render[s] a decision that cannot be located within the range of permissible decisions" (internal citation and quotation marks omitted)).

In this case, the District Court acted well within its discretion by awarding attorneys' fees. In its careful and well-reasoned memorandum decision and order, the Court reasonably and correctly concluded that it has been the longstanding and unanimous view of the CFPB, HUD, and various courts that ILSA can apply to condominium units in multi-story buildings. *See* Part A, *ante*. To be sure, Renaissance's legal argument is not frivolous; the term "land" can, in some contexts, refer specifically to the earth's surface, and prior to this opinion we had not yet ruled directly on this question. But ILSA does not limit fee awards to circumstances where a defendant's legal position

---

[12] Though Rule 4(a)(4)(B)(i) of the Federal Rules of Appellate Procedure does not address this precise situation, it is consistent with treating a premature notice of appeal, filed after the entry of a judgment but before the judgment is amended to account for the specific fees award, as effective once the judgment is amended to account for the fees amount. *See* FED. R. APP. P. 4(a)(4)(B)(i) ("If a party files a notice of appeal after the court announces or enters a judgment—but before it disposes of any motion listed in Rule 4(a)(4)(A)—the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion's entered.").

was entirely without merit. *Cf., e.g.*, *Martin*, 546 U.S. at 138 (rejecting an argument that a discretionary fees provision should only apply "on a showing that the unsuccessful party's position was 'frivolous, unreasonable, or without foundation'"). We think it is enough, as the District Court explained, that the question presented "was far from an emerging or unexplored issue, but had rather been all but directly disallowed by HUD and courts within and outside of [the Southern District of New York] and [Second Circuit]." Dist. Ct. Op. at 14. In other words, Renaissance was on notice that the condominium unit at issue was a "lot" within the meaning of ILSA. On this basis, the District Court exercised reasonable judgment by concluding that Berlin should be compensated for its attorneys' fees.

## CONCLUSION

To summarize:

(1)   We afford agency deference both to the rule promulgated by the Consumer Financial Protection Bureau and the Department of Housing and Urban Development defining the statutory term "lot," and to those agencies' consistent and longstanding interpretation of that definition as applying to condominium units in multi-story buildings.

(2)   In light of this settled agency interpretation, as well as the unanimous view of courts that have considered the same issue, we also conclude that the District Court did not err or "abuse its discretion" by awarding attorneys' fees to the plaintiffs.

Accordingly, the judgment of the District Court is **AFFIRMED**.

13

DENNIS JACOBS, Chief Judge, dissenting:

I respectfully dissent.

The Berlins contracted to purchase unit 16D in one of the residential condominium towers of the Ritz-Carlton Hotel in White Plains.  After the market crashed in 2008, they demanded rescission of the $1.34 million contract and return of their deposit, citing the Interstate Land Sales Full Disclosure Act (the "Land Sales Act"), 15 U.S.C. §§ 1701 et seq., which allows buyers in certain land transactions to seek rescission and a refund if the seller failed to make pre-sale filings and disclosures.  The primary issue in this appeal is whether the Land Sales Act applies to this transaction.  (The Berlins are certainly not invoking equity.)

## I

The statute and its implementing regulation make clear enough that the Act governs only transactions in land (whether the interest is fee simple, a condominium, or a leasehold).  See 15 U.S.C. § 1703(a)(1); Land Registration, Formal Procedures, and Advertising Sales Practices, and Posting of Notices of Suspension, 38 Fed. Reg. 23,866, 23,876 (1973) (codified at 24 C.F.R. § 1710.1).  The Land

Sales Act regulates only "the sale or lease of any lot."  15

U.S.C. § 1703(a)(1).  The Department of Housing and Urban

Development ("HUD") promulgated a regulation in 1973--which

remains in force--that defines a "lot" as "any portion,

piece, division, unit, or undivided interest in

land . . . *if the interest includes the right to the*

*exclusive use of a specific portion of the land*."  24 C.F.R.

§ 1710.1(b) (emphasis added).

HUD, which appeared <u>amicus</u> by brief and at oral

argument, supports the Berlins, and relies chiefly on its

interpretive pronouncements (and its own "intent") to expand

the regulatory scope so that HUD can regulate transactions

in high-rise condominium units that do not sit on "land" and

that are therefore not "lots."[1]  I decline to "give effect

to a reading of [the] regulations that is not the most

natural one, simply because [the agency] says that it

believes the unnatural reading is right."  <u>Decker v. Nw.</u>

_____

[1]  Under Dodd-Frank, responsibility to implement the
Land Sales Act shifted from HUD to the Consumer Financial
Protection Bureau ("CFPB").  <u>See</u> Dodd-Frank Wall Street
Reform and Consumer Protection Act, Pub. L. No. 11-203
(2010) (relevant provision codified at 12 U.S.C. § 5581).  I
use the term HUD here to refer to both HUD and the CFPB.
HUD's rules are enforceable by the CFPB, and the CFPB claims
HUD's regulations and interpretations as its own.  <u>See</u> HUD
Br. 1.

<u>Envtl. Def. Ctr.</u>, 133 S. Ct. 1326, 1339 (2013) (Scalia, <u>J.</u>, dissenting).

The only way to read the Land Sales Act and the implementing regulation is that the Act applies only to the sale (or lease) of a lot that, by definition, includes a right to use of land that is exclusive. An exclusive right is one that excludes all others. For example, each owner in a gated community of condominiums or townhouses may have a unit that sits on land from which land the owner can exclude all the world. That is not so with Apartment 16D. Unless a condominium unit sits upon land, some portion of which is land reserved exclusively to the use of the owner, it is not a "lot" within the meaning of the statute and implementing regulation.

A condominium by definition entails both an exclusive right to use a unit and a non-exclusive right to use common areas. <u>See, e.g.</u>, <u>Black's Law Dictionary</u> 336 (9th ed. 2009). So if a condominium unit sits on its own exclusive parcel of land, it is a "lot" notwithstanding that, within a development or gated community, there are amenities such as roads, clubhouses, pools, and sports facilities that are held in common by all the unit owners. By the same token, a

3

condominium unit that is a slice of a multistory residential building cannot be a "lot" of "land" within the meaning of the statute and governing regulation. *What* the Land Sales Act regulates is property that is or includes an exclusive interest in land; *how* that interest is held, whether a fee simple, a leasehold, or a condominium (for example), does not bear upon the scope of regulation.

When a condominium unit is a horizontal slice of a high-rise residential building, the owner of each unit has an exclusive right to her own unit only, without any exclusive right to use of a lot on land. This is easily demonstrated. Land entails rights above and below the surface (subject of course to covenants and zoning); but the owner of 16D cannot build up or down, because (at the risk of being obvious) that expansion would oust the unit owners of 15D or 17D. Apartment 1D may be at the plane of the land, but its owner likewise cannot build up or down--so that, if (hypothetically) 1D has an exclusive outdoor patio, the owner has no right to build up from it, let alone mine it or drill for oil.

At oral argument, counsel for amicus HUD argued that the very word "land" is itself "ambiguous." True, the word

4

"land" has its nuances; so it can be said that unit 16D is "on land" as opposed to "at sea," or "in orbit." But the word is not ambiguous in the context of the Land Sales Act and the governing regulation. Whether what is sold is a "lot" of "land" can be grasped by any child. We look to plain meaning, and few words have a meaning as plain as "land." Textual ambiguity cannot be manufactured by efforts of litigants and bureaucrats to distort, misunderstand, and overreach.

Relying on the purported ambiguity of the word "land," the majority opinion accedes to HUD's view that "exclusive use of land" actually means "exclusive use of realty." Maj. Op. at 3. The majority opinion quotes Black's Law Dictionary 955 (9th ed. 2009): "[t]he term 'land' is sometimes used to mean '[a]n estate or interest in real property,' a concept that 'is not restricted to the earth's surface, but extends below and above the surface.'" Maj. Op. at 8. True, the right to use "land" typically includes use of the air above and the earth below; but it also surely includes use of the surface. An "interest" in land may be limited to use above (air rights) or below (drilling rights), but the holder of such rights who does not also

5

have use of the surface cannot be said to have "exclusive use" of the "land," which is the defined scope of the Land Sales Act.

The fuller text of that definition (set out in the margin[2]) reflects that land is "immovable" and "indestructible." Given that land is indestructible, it cannot be multiplied (or demolished). It is proverbial that they are not making any more of it. That is why a twenty-story building on a one-acre footprint does not constitute twenty acres of "land"; and at oral argument, HUD refused to say that it does, although that is the absurd conclusion compelled by HUD's interpretation. However broad the definition of land, there is no reasonable basis for HUD's contention that the term "land" includes any interest that may have "indicia of real estate." See Maj. Op. 8.

---

[2] "Ultimately, as a juristic concept, 'land' is simply an area of three-dimensional space, its position being identified by natural or imaginary points located by reference to the earth's surface. *'Land' is not the fixed contents of that space, although, as we shall see, the owner of that space may well own those fixed contents. Land is immoveable, as distinct from chattels, which are moveable; it is also, in its legal significance, indestructible.* The contents of the space may be physically severed, destroyed or consumed, but the space itself, and so the 'land', remains immutable." Black's Law Dictionary 955 (9th ed. 2009) (emphasis added) (quoting Peter Butt, Land Law 9 (2d ed. 1988)).

6

The definition of plain words should reveal meaning, not drain it, or explode it.  Congress used the word "lot," and the regulation defines "lot" as an interest that includes the "exclusive use of . . . land."  24 C.F.R. § 1710.1(b).  HUD issued "guidance" that says the word "land" includes condominiums because they "carry the indicia of and in fact are real estate."  38 Fed. Reg. at 23,866. The majority opinion endorses the claim that the "exclusive use of land" means "exclusive use of realty."  Maj. Op. 3. But if "land" means any "realty," we are led into a rabbit hole, because "realty" can also be defined as "property," see Black's Law Dictionary 1379 (9th ed. 2009), and "property" is defined as "the right to possess, use, enjoy a determinate thing," which in turn is "[a]ny external thing over which the rights of possession, use, and enjoyment are exercised," id. at 1335-36.  That is not a useful process of definition.

## II

Extension of the Land Sales Act to high-rise condominiums by administrative fiat is, as demonstrated, untenable as a textual matter.  This was no drafting error

7

by Congress: the text is drawn to reach the evils that Congress wished to curb, and those evils did not include subjecting the Berlins to life at the Ritz-Carlton in Westchester.

The Act targeted deceptive and fraudulent sales of undeveloped lots of land, transactions which (in the 1960s) were often carried out by mail or by telephone.  Promoters duped unsuspecting people, often senior citizens, into purchasing, sight unseen, "land in swamps, deserts, high arid plateaus, mountains, remote valleys, jungles and lava beds."  Note, S. 275--The Interstate Land Sales Full Disclosure Act, 21 Rutgers L. Rev. 714, 714 (1967); see also Frauds & Quackery Affecting the Older Citizen: Hearing Before the Senate Special Comm. on Aging, 88th Cong. 203 (1963) (Statement of J. Fred Talley, Ariz. State Real Estate Comm'r) (referencing home-sites "so far from anywhere" that "a jackrabbit would need a canteen to get there"); id. at 183 (Statement of Sen. Goldwater, Member, Senate Special Comm. on Aging) (describing "land swindles" in Arizona where so-called "subdivisions" had no water, and in some cases, no roads or power).

President Johnson endorsed the Act because some senior citizens had "wasted much of their life savings on a useless piece of desert or swampland."  To Protect the American Consumer--Message from the President of the United States, H.R. Doc. No. 57, 90th Cong., 1st Sess., reprinted in 113 Cong. Rec. 3527, 3529 (Feb. 16, 1967).  Shortly after its passage, the Supreme Court confirmed that the Land Sales Act was "designed to prevent false and deceptive practices in the sale of *unimproved tracts of land*."  Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla., 426 U.S. 776, 778 (1976) (emphasis added).

The proper scope of the Act is illustrated by HUD's own disclosure requirements.  HUD's regulations specify that in the property report (required by Section 1707 of the Land Sales Act) developers must disclose to buyers whether "oil, gas or mineral rights have been reserved" by the developer. 24 C.F.R. § 1710.109(b)(4).  Likewise, the property report must describe the "general topography and the major physical characteristics" of the land.  Id. § 1710.115(a); see also id. (requiring developer to disclose whether "any lots in the subdivision have a slope of 20% or more"); id. § 1710.115(b)-(c) (requiring developer to disclose whether

9

the lot is "covered by water" and whether the lot requires "draining or fill prior to being used").  However, since unit 16D has no subterranean resources, no slope, no wetlands, and no topographical features of any kind, such disclosure--like the Act itself--has no application to it.

**III**

At oral argument, counsel for HUD pressed us to recognize "HUD's intention."  However, it is the intent of Congress that matters, not that of the agency.  We defer to an agency only because it is presumed to have expertise in filling gaps that Congress left open, not because it has ambition to expand the limited scope of regulation Congress confided to it.  See Decker, 133 S. Ct. at 1340 (Scalia, J., dissenting) ("The implied premise of this argument--that what we are looking for is the agency's *intent* in adopting the rule--is false.").

HUD does not seek deference to the Land Sales Act or to HUD's 1973 regulations; together, they actually foreclose HUD's argument.  HUD is demanding deference to its own overreading of the regulatory preamble, which says that "*condominiums carry the indicia of and in fact are real*

10

*estate* whether or not the units therein have been constructed." 38 Fed. Reg. at 23,866 (emphasis added). But HUD's argument begs the question whether the preamble is referencing a condominium *that has exclusive use of land and is thereby on a lot.* Insofar as HUD construes this guidance in a way inconsistent with its regulations, we owe it no deference. See Auer v. Robbins, 519 U.S. 452, 461 (1997).

True, the agency's reading of its own regulations need not be the best one, see Maj. Op. at 7-8; but even if the word "land" were ambiguous, HUD's interpretation of the word is gravity-defying, literally. The majority emphasizes that HUD has "consistently maintained this understanding ever since the issue was first raised in 1969." Maj. Op. at 9. But a misunderstanding is not improved by consistency.

The majority opinion adopts the arguments made in HUD's letter to this Court, which cites chiefly to HUD's self-serving guidance. See HUD Br. 10. Twenty years after the regulation at issue was promulgated, the Office of Interstate Land Sales Registration ("OILSR") purported to "streamline" the land sales registration program, and offered interpretive guidance as to some of the Land Sales Act's exemptions. See Federal Housing Commissioner;

11

Interstate Land Sales Registration Program; Streamlining Final Rule, 61 Fed. Reg. 13,596, 13,596, 13,602 (1996). This guidance could not alter the regulation, let alone the statute itself. Indeed, the self-limited goal of the guidelines accompanying the "streamlining" was to clarify the scope of certain exemptions: "This is an interpretive rule, not a substantive regulation." Id. at 13,601.

OILSR's streamlining guidelines defined a "lot" as "any portion, piece, division, unit, or undivided interest in land if such interest includes the right to the exclusive use of a specified portion of the land *or unit. This applies to the sale of a condominium . . .* as well as a traditional lot." Id. at 13,602 (emphases added). HUD and the Berlins now rely on this "guidance" to support their expansive view, see HUD Br. 4, 9-10; but we owe no deference to HUD's interpretive guidance if it *contradicts* the statute and HUD's own regulation. See Auer, 519 U.S. at 461.

In any event, this streamlining would not delink coverage under the Land Sales Act from land itself, because it is altogether unclear what, if anything, it adds. The 1973 regulation defines "lot" as any portion, piece, division, or unit of land (or undivided interest in land),

12

if--and only if--the portion, piece, division, unit, or undivided interest includes the right to "exclusive use of a specific portion of the land." 24 C.F.R. § 1710.1(b). The 1996 guidance adds "or unit" to the second clause, which HUD argues expands coverage of the Land Sales Act to any "unit" that includes exclusive use of that unit.[3] That reading is untenable. The natural way to read this addition--sloppy and incoherent as it is--is that a unit of land is a "lot" if it includes the right to exclusive use of that unit of land. That much was already clear from the 1973 regulation.[4]

_____

[3] Relevant portions of the 1973 regulations and the 1996 guidance are set out below:

> Lot means any portion, piece, division, unit, or undivided interest in land located in any State or foreign country, if the interest includes the right to the exclusive use of a specific portion of the land.

24 C.F.R. § 1710.1(h) (1973) (currently codified at 24 C.F.R. § 1710.1(b)).

> Lot means any portion, piece, division, unit or undivided interest in land if such interest includes the right to the exclusive use of a specific portion of the land or unit. This applies to the sale of a condominium or cooperative unit or a campsite as well as a traditional lot.

61 Fed. Reg. at 13,602 (1996).

[4] The second reference to "unit," which purportedly gives HUD authority when there is "exclusive use of

13

HUD's *ipse dixit* that the definition of lot "applies to the sale of a condominium" also adds nothing. See 61 Fed. Reg. at 13,602. It goes without saying that condominium ownership (like a fee or leasehold) is one way to hold a lot of land. So the Land Sales Act may of course apply to the sale of a condominium unit on a lot of land. But it does not follow that it applies to all property held in condominium form.[5]

Although it plainly defined "lot" to require the exclusive use of "land," HUD jumbles together its various semi-literate guidelines and interpretations to expand its regulatory reach. The argument that HUD spins from its

a . . . unit" adds nothing because the first clause of the sentence continues to define a "lot" as a portion, piece, division, unit, or undivided interest "*in land*."

[5]  HUD points to another regulatory guidance, from a 1974 "guideline" regarding the applicability of certain exemptions under the Land Sales Act, which references OILSR's "'aware[ness] of the realities of condominium construction, especially high-rise construction.'" HUD Br. 10-11 (quoting Condominium and Other Construction Contracts Guidelines, 39 Fed. Reg. 7,824, 7,824 (1974)). This "awareness" could not change the text of the Land Sales Act or of the governing regulation--which covers only exclusive interests in land. And a full reading of the 1974 guidance makes evident that it was addressing the problem of HUD property reports being delivered to potential buyers before subdivisions were even registered with HUD, giving unscrupulous developers a spurious imprimatur of HUD approval.

"guidance"--and that the majority opinion adopts--rests uneasily on a classic false syllogism: *Land is real estate; all condominiums are real estate; therefore, all condominiums are land.*