FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DEAN BEAVER, Husband; LAURIE BEAVER, Wife; STEVEN ADELMAN, an individual; ABRAM AGHACHI, an individual; DINESH GAUBA, an individual; KEVIN KENNA, husband and wife, on behalf of themselves and all others similarly situated; VERONICA KENNA, husband and wife, on behalf of themselves and all others similarly situated, *Plaintiffs-Appellees*, <br><br> v. <br><br> TARSADIA HOTELS, a California corporation; TUSHAR PATEL, an individual; B.U. PATEL, an individual; GREGORY CASSERLY, an individual; 5TH ROCK LLC, a Delaware limited liability company; MKP ONE, LLC, a California limited liability company; GASLAMP HOLDINGS, LLC, a California limited liability company, *Defendants-Appellants*. | No. 15-55106 <br><br> D.C. No. 3:11-cv-01842-GPC-KSC <br><br><br> OPINION |

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted
January 4, 2016—Pasadena, California

Filed March 10, 2016

Before: MILAN D. SMITH, JR., PAUL J. WATFORD,
and MICHELLE T. FRIEDLAND, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

**SUMMARY**[*]

**California Unfair Competition Law**

The panel affirmed the district court's partial grant of summary judgment in favor of purchasers of non-residential condominiums who claimed that a group of developers and their agents or affiliates committed unlawful business practices in violation of California's Unfair Competition Law (UCL) by failing to make certain disclosures in the course of sale transactions, as required by the Interstate Land Sales Full Disclosure Act (ILSA).

Defendants conceded that they failed to comply with ILSA's disclosure requirements, but raised a series of affirmative defenses, which the district court rejected.

The panel held that the UCL's four-year statute of limitations applied, and was not preempted, and ILSA's

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

three-year statute of limitations did not bar plaintiffs' UCL claim.

The panel rejected defendants' argument that ILSA did not apply because plaintiffs' condominium units were not qualifying "lots" under ILSA. Guided by agency interpretations of ILSA, the panel concluded that plaintiffs had "exclusive repeated use" of their units, which therefore qualified as "lots."

The panel held that the condominium units were not exempt under ILSA's Improved Lot Exemption.

The panel held that a 2014 amendment to ILSA, passed after the commencement of these proceedings, and exempting condominium sales from ILSA's disclosure requirements, did not operate to extinguish defendants' liability. The panel held that the amendment was a substantive change in the law, rather than a clarification, and did not operate retroactively.

---

## COUNSEL

Frederick H. Kranz (argued) and Lynn Therese Galuppo, Cox, Castle & Nicholson, LLP, Irvine, California; David Wesley Moon, Stroock & Stroock & Lavan LLP, Los Angeles, California, for Defendants-Appellants.

Michael Rubin (argued), Altshuler Berzon LLP, San Francisco, California; Donald E. Chomiak, Talisman Law, P.C., Glendale, California; Tyler R. Meade, The Meade Firm P.C., Berkeley, California; Michael L. Schrag, Gibbs Law Group LLP, Oakland, California, for Plaintiffs-Appellees.

---

## OPINION

M. SMITH, Circuit Judge:

Plaintiffs Dean Beaver, Laurie Beaver, Steven Adelman, Abram Aghachi, Dinesh Gauba, Kevin Kenna, and Veronica Kenna are the purchasers of non-residential condominium units in San Diego's Hard Rock Hotel & Condominium Project (the Hard Rock Project). Plaintiffs brought this putative class action against Defendants,[1] a group of developers and their agents or affiliates who allegedly participated in the sale of the condominium units. Plaintiffs claimed, *inter alia*, that Defendants' business practices violated California's Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 *et seq*.

Specifically, Plaintiffs alleged that Defendants failed to make certain disclosures in the course of the sale transactions, as required by the Interstate Land Sales Full Disclosure Act (ILSA), 15 U.S.C. § 1701 *et seq*., which applies in this case by operation of the UCL's prohibition against "unlawful" business practices. Cal. Bus. & Prof. Code §§ 17200.

Defendants concede that they failed to comply with ILSA's disclosure requirements. They instead raise a series of affirmative defenses, contending that (1) ILSA's statute of limitations, 15 U.S.C. § 1711, bars Plaintiffs' UCL claim; (2) ILSA does not apply because Plaintiffs' condominium units

---

[1] Defendants include the following business entities and individuals: 5th Rock, LLC; Tarsadia Hotels; MKP One, LLC (MKP); Gregory Casserly; Tushar Patel; B.U. Patel; and Gaslamp Holdings. Plaintiffs, however, did not seek summary judgment against Defendants Gaslamp Holdings, LLC, or B.U. Patel with respect to the issues now on appeal.

are not considered qualifying "lots" under ILSA, *see* 12 C.F.R. § 1010.1(b); (3) the condominium units are exempt under ILSA's Improved Lot Exemption, 15 U.S.C. § 1702(a)(2); and (4) a 2014 amendment to ILSA, 15 U.S.C. § 1702(a)(2), passed after the commencement of the current proceedings, operates to extinguish Defendants' liability in connection with the condominium sales.

The district court rejected each of these four arguments and granted partial summary judgment in favor of Plaintiffs on the portion of their UCL claim that was premised on the existence of an "unlawful" business practice under ILSA. Nonetheless, the district court certified these four issues for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b). We granted Defendants' petition for interlocutory appeal, and we now affirm the district court's partial summary judgment order with respect to the certified issues.[2]

---

[2] Defendants also claim that the district court's summary judgment order was in error with respect to Defendants MKP, Gregory Casserly, and Tushar Patel because they did not exercise the requisite control over the alleged unlawful conduct. This issue was not certified by the district court for interlocutory appeal. While we retain jurisdiction to review claims not certified by the district court, *see Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 204 (1996), we decline Plaintiffs' invitation to address this issue on interlocutory appeal. Instead, we direct the district court to examine the fact-bound question of UCL liability with respect to Defendants MKP, Tushar Patel, and Gregory Casserly when it resumes jurisdiction over the proceedings following the conclusion of this appeal. *See Merritt v. Countrywide Fin. Corp.*, 759 F.3d 1023, 1034 (9th Cir. 2014). Furthermore, Defendants contend, and Plaintiffs agree, that the district court's entry of summary judgment against Defendants B.U. Patel and Gaslamp Holdings, LLC, was in error because Plaintiffs did not move for partial summary judgment against these two entities. The district court has not had the opportunity to rectify any alleged error in the liability of these Defendants because it denied Defendants' motion to reconsider

## FACTS AND PRIOR PROCEEDINGS

### A.  The Parties

The Hard Rock Project, located at 205 Fifth Avenue in downtown San Diego, is a mixed-use development that includes the Hard Rock Hotel and 420 commercial condominium units. Plaintiffs are a group of individual purchasers of non-residential condominium units in the Hard Rock Project. Defendant 5th Rock, LLC (5th Rock) was the developer of the condominium units and sold these units to Plaintiffs. Defendant MKP operated as the managing member of 5th Rock and signed the condominium purchase contracts on 5th Rock's behalf. 5th Rock enlisted the assistance of Defendant Tarsadia Hotels (Tarsadia) in the development and subsequent management and operation of the properties. Defendant Greg Casserly served as Tarsadia's president, and Defendant Tushar Patel served as Tarsadia's chairman.

### B.  The Purchase Transactions

Plaintiffs purchased the condominium units from 5th Rock before construction of the Hard Rock Project was completed. The condominium purchase contracts were signed in May 2006 by one set of Plaintiffs, and in December 2006 by the remaining Plaintiffs. These purchase contracts called for estimated completion dates between August 2007 and September 2007, and a closing date of no later than December 29, 2007. In addition, the purchase contracts contained clauses specifying that "except for delays caused by circumstances beyond Seller's reasonable control or the

---

pending the outcome of this interlocutory appeal. Accordingly, we direct the district court to also resolve this issue on remand.

failure to complete due to a permitted excuse, Seller shall use commercially reasonable efforts to complete the construction of the Unit by the Estimated Completion Date."

One of the "permitted excuses" to timely completion was contained in a pre-sale contingency clause, which gave Defendants the "unilateral right" to terminate the contract if less than 75% of the condominium units were sold or under contract by the closing date. By December 2006, more than 75% of the condominium units at the Hard Rock Project were under contract.

The purchase contracts also required that Plaintiffs execute a unit maintenance and operation agreement (UMA) as part of the sale transaction. The UMA contained several restrictions on Plaintiffs' use of the units. The UMA limited Plaintiffs' rights to occupy the condominium units to a maximum of twenty-eight days per year. Moreover, the UMA mandated that the properties could only be resold as non-residential condominium units, required that the properties be managed as part of the Hard Rock Hotel, and granted the Hard Rock Hotel a right of first refusal in the event that a Plaintiff wished to sell his condominium unit. Plaintiffs also agreed that the hotel would control the room furnishings and other routine housekeeping and maintenance services in the units.

## C. Post-Transaction Events

Separately, in 2007, Plaintiffs entered into Rental Management Agreements (RMAs) that appointed Tarsadia as property manager with the "sole and exclusive authority to manage, operate, market and rent" the condominium units. The terms of the RMA gave Tarsadia the right to "enter the

Unit, without Notice to Owner, from time to time, and at any time, for any purpose set forth in this Agreement."

Construction of the condominium units was completed around October of 2007. Between October and December of 2007, Plaintiffs closed escrow on their respective condominium units. Plaintiffs contend that they would have cancelled the purchase contracts prior to closing escrow had Defendants complied with their disclosure obligations and made Plaintiffs aware of their statutory rescission rights under ILSA.

**D.  Procedural History**

On May 18, 2011, Plaintiffs brought a putative class action in California state court against Defendants, alleging violations of federal and state laws, including the UCL, in connection with the sale of the condominium units. Defendants later removed the action to federal court in the Southern District of California under the Class Action Fairness Act, 28 U.S.C. § 1332(d).

Plaintiffs' claims were predicated, in part, on allegations of unlawful conduct through Defendants' failure to comply with ILSA. The parties filed cross-motions for partial summary judgment on those UCL claims arising from Defendants' failure to comply with ILSA's disclosure requirements. The district court initially granted summary judgment to Defendants on the basis that Plaintiffs' UCL claim was time-barred, but later reversed its holding after Plaintiffs filed a motion for reconsideration. The district court ultimately issued a new order, allowing Plaintiffs' UCL claim to proceed and awarding partial summary judgment in Plaintiffs' favor.

In 2014, while a motion for reconsideration from Defendants was pending before the district court, Congress passed an amendment to ILSA (the 2014 Amendment), codified at 15 U.S.C. § 1702(b)(9). This amendment exempts condominium sales from the same ILSA disclosure requirements upon which Plaintiffs had predicated their UCL claim. After additional briefing from the parties, the district court concluded that the 2014 Amendment had no retrospective application in the present action.

Nonetheless, the district court certified the issue, as well as other issues of law involved in its partial summary judgment order, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We granted Defendants' petition for interlocutory appeal.

## STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 772 (9th Cir. 2002). We view the evidence in the light most favorable to the non-moving party. *Id.* Where disputed facts exist, the plaintiff's representations of these facts are assumed to be correct for the purposes of deciding the summary judgment motion. *Id.* The district court's determinations on questions of law are reviewed de novo. *See Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).

## DISCUSSION

### I.  The Statute of Limitations

The UCL is a California consumer protection statute that broadly proscribes the use of any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code. § 17200. The UCL operates as a three-pronged statute: "Each of these three adjectives [unlawful, unfair, or fraudulent] captures a 'separate and distinct theory of liability.'" *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quoting *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009)). Plaintiffs alleged theories of liability under each of the three prongs, but only moved for partial summary judgment on the UCL's "unlawful" prong. The UCL's "unlawful" prong looks to other sources of substantive law, such as ILSA, to proscribe the kinds of unlawful business practices punishable under the statute. *See Prakashpalan v. Engstrom, Lipscomb and Lack*, 167 Cal. Rptr. 3d 832, 855–56 (Cal. Ct. App. 2014).  In doing so, the UCL "borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel–Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 539–40 (Cal. 1999) (citations omitted).

### A.  State or Federal Law?

As a threshold matter, the parties dispute the appropriate limitations period to be applied to a UCL claim premised on a violation of federal law, specifically in this case ILSA. California courts have adopted two principles that inform our analysis. First, as a general matter, the UCL statute of limitations will apply to a UCL claim, even when that claim is based on an underlying law with its own separate statute of

limitations. *See Cortez v. Purolator Air Filtration Prods. Co.*, 999 P.2d 706, 716 (Cal. 2000).[3] Second, a UCL claim generally accrues when each of the elements of the cause of action is satisfied. *See Aryeh v. Canon Bus. Solutions, Inc.*, 292 P.3d 871, 878 (Cal. 2013).

In this case, the district court granted partial summary judgment on Plaintiffs' claim under the "unlawful" prong of the UCL. Plaintiffs' claim under this particular prong of the statute is predicated on Defendants' failure to comply with ILSA's disclosure requirements, set forth in 15 U.S.C. §§ 1703(a)(1)(A), 1703(a)(1)(B), and 1703(d).[4] ILSA includes a three-year statute of limitations, which accrues from the date the purchase contract is signed. 15 U.S.C. § 1711. Were ILSA's statute of limitations to apply to Plaintiffs' UCL claim, their claim would be time-barred because it was brought on May 18, 2011, approximately five years after the signing of the purchase contracts in May and December of 2006. The UCL, however, includes a more generous four-year statute of limitations. Because Plaintiffs have pled a claim under the UCL, this four-year period applies. Cal. Bus. & Prof. Code § 17208; *see Cortez*, 999 P.2d at 716.

Importantly, the UCL statute of limitations is "governed by common law accrual rules." *Aryeh*, 292 P.3d at 878.

---

[3] Although the parties were unable to point us to a case that expressly discussed whether this principle extends to UCL claims predicated on violations of federal law, we read *Cortez* as announcing a general rule for all UCL claims regardless of the source of the law allegedly violated.

[4] For brevity, we will refer to Plaintiffs' UCL claim brought under the "unlawful" prong of the statute as "the UCL claim."

Common law rules provide that a cause of action ordinarily accrues when each of the elements of the cause of action (wrongdoing, causation, and harm) has been satisfied. *See id*. at 879. Therefore, under the UCL's statute of limitations, the cause of action accrued when the harm was completed. Plaintiffs allege that the harm became complete in the fall of 2007 when they were required to close escrow on their respective properties. Because Plaintiffs suffered cognizable financial harm upon the closing of escrow, we find this calculation of the accrual date to be sound. Although the alleged wrongdoing, *i.e.* Defendants' failure to disclose, occurred at or around the date of contract signing, the financial harm—which gives standing to Plaintiffs under the UCL—occurred at a later date. Under the UCL, only the government or "a person who has suffered injury in fact and has lost money or property as a result" may bring a claim. Cal. Bus. & Prof. Code § 17204. Plaintiffs' UCL claim hinges on their lack of awareness of their two-year recission right under 15 U.S.C. § 1703(c), a right which was not disclosed to Plaintiffs prior to closing escrow on their units.

Particularly in light of the remedial purposes of the UCL, we agree that Plaintiffs' claim accrued at the time of "injury in fact"—and not upon the commission of a technical violation of the underlying ILSA disclosure provision. As the appropriate statute of limitations and the accrual date are part and parcel of the same procedural determination, our resolution of both issues is drawn from the same body of law—here, state law. As the California Supreme Court recently confirmed in *Rose v. Bank of America, N.A.*, a UCL claim based on violations of a federal statute is "independently actionable" under the UCL, which contains "its own distinct and limited equitable remedies." 304 P.3d 181, 185 (Cal. 2013). Because the UCL's four-year statute of

limitations and its accompanying accrual rules apply, the district court properly concluded that Plaintiffs' UCL claim is not time-barred.

## B. Federal Preemption of the State Statute of Limitations

The remaining question is whether the application of the UCL's more generous statute of limitations period is preempted by federal law. The Supremacy Clause provides the constitutional foundation for federal authority to preempt state law. *See* U.S. Const. art. VI, cl. 2 (federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."); *Kurns v. R.R. Friction Prods. Corp.*, 132 S. Ct. 1261, 1265 (2012). Preemption of state law, by operation of the Supremacy Clause, can occur in one of several ways: express, field, or conflict preemption. *Kurns*, 132 S. Ct. at 1265–66. Defendants have argued that the UCL's statute of limitations presents a case of conflict preemption. Conflict preemption occurs when a state law conflicts with federal law, such that the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

Our preemption analysis is driven by the presumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). This presumption carries the "greatest force" when federal legislation encroaches on an area

traditionally occupied by the states, such as the field of property law. *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2189 (2014). "The case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there [is] between them." *Wyeth*, 555 U.S. at 575 (alteration in original) (quoting *Bonito Boats v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 166–67 (1989)). Accordingly, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *CTS Corp.*, 134 S. Ct. at 2188 (quoting *Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008)).

In making their conflict preemption argument, Defendants portray ILSA's statute of limitations, 15 U.S.C. § 1711, as a statute of repose, whose purpose was to shield developers and their agents from liability after a strict cut-off period of three years. Unlike a statute of limitations, a statute of repose reflects a congressional "judgment that a defendant should be free from liability after the legislatively determined period of time." *See CTS Corp*, 134 S. Ct. at 2183 (internal quotations omitted).

In support of this argument, Defendants point to a distinction between the language of ILSA's statute of limitations for disclosure violations, such as the violations alleged in this case, and ILSA's separate statute of limitations governing claims alleging fraudulent activity. The text of the limitations statute for ILSA disclosure violations provides that "[n]o action shall be maintained . . . more than three years after the date of signing of the contract of sale or lease." 15 U.S.C. § 1711(a)(1). The statute of limitations for an ILSA

claim alleging fraudulent activity, in contrast, accrues at the time of discovery of such activity. 15 U.S.C. § 1711(a)(2). This statutory distinction does not indicate that Congress wished to turn ILSA's limitations period into a statute of repose for disclosure violations.

Rather, this distinction merely suggests that Congress wished to provide a different accrual period to ILSA's fraud-based claims than to ILSA's disclosure provisions. This choice is hardly unusual in light of the fact that fraud, by its very nature, begins unknown to the victim. *See* Cal. Civ. Proc. Code § 338(d) (fraud claims do not accrue "until the discovery, by the aggrieved party, of the facts constituting the fraud"). Given that we read ILSA as having a limitations period for disclosure violations, and not a statute of repose, there is no statute of repose that would potentially preempt state consumer protection laws' longer limitations periods.

Nor does ILSA otherwise preempt Plaintiffs' UCL claim. *Crosby* instructs us to consider issues of conflict preemption "by examining the federal statute as a whole and identifying its purpose and intended effects." 530 U.S. at 373. Here, no congressional purpose to preempt the application of state consumer protection statutes can be divined from the text or history of ILSA. To the contrary, ILSA provides that its "rights and remedies . . . shall be in addition to any and all other rights and remedies that may exist at law or in equity." 15 U.S.C. § 1713. ILSA also contains a saving clause, stating that "[n]othing in this chapter may be construed to prevent or limit the authority of any State or local government to enact and enforce with regard to the sale of land any law, ordinance, or code not in conflict with this chapter." 15 U.S.C. § 1708(e). Moreover, ILSA offers a procedure where state disclosure laws that are "substantially equivalent"

to ILSA's disclosure provisions may be formally certified as such to facilitate compliance and enforcement. *See* 15 U.S.C. § 1708. These parts of the statute all expressly allow for states to supplement ILSA's provisions with their own requirements. S*ee Williamson v. Mazda Motors of Am.*, *Inc.*, 562 U.S. 323, 335 (2011) (finding no conflict preemption in light of "statutory saving clause that foresees the likelihood of a continued meaningful role for state tort law"); *cf. Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 870 (2000) (declining to "give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law").

Finally, Defendants rely on *Silvas v. E\*Trade Mortg. Corp.*, 514 F.3d 1001, 1007 n.3 (9th Cir. 2008) to argue that Plaintiffs cannot avoid the application of ILSA's statute of limitations by invoking the UCL. *Silvas* involved a case of field preemption, in which the court held that the Home Owners' Loan Act (HOLA), 12 U.S.C. §§ 1461–1470, "preempted the entire field of lending regulation" to the exclusion of any state regulation. *Silvas*, 514 F.3d at 1008. In footnote 3 of the opinion, the *Silvas* Court commented on an issue that it explicitly stated it was not reaching. *Id*. at 1006. The footnote reads: "[T]o take advantage of the longer statute of limitations under [the] UCL . . . . is an attempt to enforce a state regulation in an area expressly preempted by federal law." *Id*. at 1007 n.3. This footnote, to the extent it is relevant at all in this case, appears to be limited to cases involving field preemption under HOLA.[5]

---

[5] A number of district courts have adopted an unnecessarily broad reading of footnote 3 in *Silvas* by extending its reasoning outside of HOLA's field preemption context. *See, e.g.*, *Jones v. Wells Fargo Bank, NA*, No. 13-cv-903 NC, 2013 WL 2355447, at \*4 (N.D. Cal. May 29,

We conclude that Defendants fail to overcome the strong presumption against preemption, and that ILSA's three-year statute of limitations does not bar Plaintiffs' UCL claim.

## II. ILSA's Disclosure Provisions

Once Plaintiffs have surpassed the statute of limitations hurdle, they must show that ILSA's disclosure provisions apply to the condominium units they purchased. Collectively, these provisions mandate that sellers file a statement of record with the Department of Housing and Urban Development (HUD); provide buyers with a property report; include a twenty-day cure provision in the purchase contracts; and offer buyers a two-year right to rescind the contracts when sellers fail to meet these statutory disclosure requirements. 15 U.S.C. §§ 1703(a)(1)(A), 1703(a)(1)(B), and 1703(d)(2).

---

2013) (holding that TILA claims that are time-barred cannot be recast as UCL claims subject to a longer limitations period); *Rodriguez v. U.S. Bank Nat'l Ass'n*, No. C 12-00989 WHA, 2012 WL 1996929, at *2 (N.D. Cal. June 4, 2012) (same); *Newsom v. Countrywide Home Loans, Inc.*, 714 F. Supp. 2d 1000, 1014 (N.D. Cal. 2010) (same); *Champlaie v. BAC Home Loans Serv., LP*, 706 F. Supp. 2d 1029, 1045 (E.D. Cal. 2009) (same); *Distor v. U.S. Bank NA*, No. C 09-02086 SI, 2009 WL 3429700, at *8 (N.D. Cal. Oct. 22, 2009) (same); *Santos v. Countrywide Home Loan*, No. 1:09-cv-00912-AWI-SM, 2009 WL 2500710, at *7 (E.D. Cal. Aug. 14, 2009) (same); *Adams v. SCME Mortg. Bankers Inc.*, No. CV F 09-0501 LJO SMS, 2009 WL 1451715, at *10 (E.D. Cal. May 22, 2009) (same); *see also O'Donovan v. Cashcall, Inc.*, No. C 08-03174 MEJ, 2012 WL 2568174, at *3 (N.D. Cal. July 2, 2012) (UCL claim predicated on violation of the Electronic Funds Transfer Act was subject to federal statute of limitations). *But see Sonoda v. Amerisave Mortg. Corp.*, No. C-11-1803 EMC, 2011 WL 2690451, at *8–9 (N.D. Cal. July 8, 2011) (holding that *Silvas* was properly limited to cases of HOLA preemption).

Defendants do not dispute that they failed to satisfy ILSA's disclosure requirements. Rather, they maintain that ILSA is inapplicable, and thus no disclosures are required, because Plaintiffs did not have "exclusive use" of the properties pursuant to 12 C.F.R. § 1010.1(b), and because the condominiums were exempted from ILSA's requirements pursuant to the Improved Lot Exemption, 15 U.S.C. § 1702(a)(2). We address each of these arguments in turn.

## A. Exclusive Use

ILSA's disclosure requirements apply to "lots," a term not defined by the statute itself. *See, e.g.*, 15 U.S.C. § 1701. The companion regulations to ILSA, promulgated by HUD in 1973, and later adopted by its successor agency, the Consumer Financial Protection Bureau, provide that a "lot" refers to "any portion, piece, division, unit or undivided interest in land . . . if the interest includes the right to the *exclusive use* of a specific portion of the land." 12 C.F.R. § 1010.1(b) (emphasis added); *see Berlin v. Renaissance Rental Partners*, *LLC*, 723 F.3d 119, 121 n.2 (2d Cir. 2013).

For decades, a long line of cases has consistently held that condominiums may be considered "lots" under ILSA. *See Berlin*, 723 F.3d at 126–27; *Winter v. Hollingsworth Props., Inc.*, 777 F.2d 1444, 1447 (11th Cir. 1985). Indeed, "'the application of [ILSA] to condominiums has been consistent [with HUD] policy since the issue was first raised in 1969'—the year that ILSA took effect." *Berlin*, 723 F.3d at 124 (first alteration in original) (quoting Land Registration, Formal Procedures, & Advert. Sales Practices, & Posting of Notices of Suspension, 38 Fed. Reg. 23,866 (Sept. 4, 1973) (to be codified at 24 C.F.R. pts. 1700, 1710, 1715, 1720)).

Under *Chevron*, we must defer to an administering agency's "reasonable interpretation of an ambiguous statute" when that interpretation is the result of the agency's formal rulemaking procedures. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984). Here, the agency regulation requiring "exclusive use" is a reasonable interpretation of the word "lot," and it is entitled to *Chevron* deference. Indeed, the agency's regulation gives effect to Congress's purpose in enacting ILSA to protect general "interests in realty," which included condominiums. *See Winter*, 777 F.2d at 1448.

In 1996, HUD issued additional guidance clarifying its earlier definition of "exclusive use" in the context of lots:

> If the purchaser of an undivided interest or a membership has exclusive repeated use or possession of a specific designated lot even for a portion of the year, a lot, as defined by the regulations, exists. For purposes of definition, if the purchaser has been assigned a specific lot on a recurring basis for a defined period of time and could eject another person during the time he has the right to use that lot, then the purchaser has an exclusive use.

61 Fed. Reg. 13,596, 13,602 (Mar. 27, 1996) (to be codified at 24 C.F.R. pts. 1700, 1710, 1715)).

Because this interpretative guidance was not subject to a formal agency adjudication or rulemaking process, it is entitled to a lesser form of deference under *Skidmore*, according to its power to persuade. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). Under *Skidmore*, the

persuasiveness of the agency's interpretation is determined in part by "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements." *Id.* Here, the agency's detailed clarification of the term "exclusive use" conforms to the historic purposes of ILSA by extending its disclosure protections to certain real estate interests, provided that the owner possesses a right to use the unit "on a recurring basis for a defined period of time" during the year. Moreover, the agency's understanding of "exclusive use," as demonstrated through the core right of a property owner to "eject another person," is fully consistent with the statutory text. As a result, we find the agency's gloss on the meaning of "exclusive use" to be persuasive under *Skidmore*, and entitled to deference on review.

Guided by these agency interpretations, we next examine whether Plaintiffs had "exclusive repeated use" of their units. 61 Fed. Reg. 13,602. Defendants contend that Plaintiffs' specific purchase contracts did not provide Plaintiffs with exclusive use of the condominiums due to a series of use restrictions on the properties. They cite *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, a Sixth Circuit case, in support of their claim. 127 F.3d 478 (6th Cir. 1997). In *Becherer*, the court held that ILSA's disclosure provisions did not apply when buyers purchased commercial condominium units as investment properties that were so laden with use restrictions that the owners could not be said to have had "exclusive" use of those properties. *Id.* at 482. Specifically, the *Becherer* Court relied on facts indicating that, "when the units were purchased, they were already restricted for use as a hotel as a business investment, and thus were never available for use at the discretion of the unit owners." *Id*. In particular, the owners in *Becherer* were only given

permission to occupy the units for fourteen days per year. *Id*. Moreover, their rights to eject tenants were assigned to the property manager through the purchase contracts and so "never truly resided with the unit owners." *Id*.

Defendants attempt to analogize the facts of the present case to those in *Becherer*. First, Defendants point to contractual restrictions that limited Plaintiffs' rights to stay in the condominiums to a maximum of twenty-eight days per year. In addition, the condominiums could only be resold as non-residential condominium units, managed as part of the Hard Rock Hotel, which possessed a right of first refusal in case of sale. These use restrictions were memorialized in the UMAs. Under the terms of the UMAs, the Hard Rock Hotel also controlled the room furnishings as well as routine maintenance and cleaning services in the units.

Nonetheless, the provisions of the purchase contracts did entitle Plaintiffs to the use of a "specific lot on a recurring basis for a defined period of time." 61 Fed. Reg. 13,602. The use restrictions were of a more limited nature than in *Becherer* and, importantly, did not directly interfere with Plaintiffs' ownership right to eject tenants during the designated period of use.

The Hard Rock Hotel's provision of routine maintenance, cleaning, and management services is not dispositive either. In this respect, Plaintiffs' position is akin to that of an apartment owner who retains exclusive use of the apartment, but contracts with a third party for the provision of room furnishings and maid service, or engages a third party to rent out the unit for a portion of the year. The "exclusive use" inquiry focuses on the basic right of the owner to "eject another person during the time he has the right to use that

lot." *Id.* Under the terms of the purchase agreements, Plaintiffs retain the exclusive use of the units during that "defined period of time." *Id.*[6]

Finally, Defendants point to Plaintiffs' separate agreements in an RMA. The RMA delegated to Tarsadia the "sole and exclusive authority to manage, operate, market and rent" the units. The RMA also gave Tarsadia the right to "enter the Unit, without Notice to Owner, from time to time, and at any time, for any purpose set forth in this Agreement." These use restrictions were relatively sweeping, permitting Tarsadia to "vary the frequency and length of the rental of the Unit for any reason."

However, the RMA was a voluntary agreement that Plaintiffs executed in 2007, subsequent to the closing of the condominium sales. As a result, its use restrictions are not determinative of whether Plaintiffs had "exclusive use" under the relevant purchase contracts. *Becherer*, in contrast, involved curtailed rights of ownership to which the buyers had agreed in the original sale contracts, rather than provisions that were voluntarily adopted at a later date. In the present case, Plaintiffs could freely choose whether to execute the RMA. Because the RMA was not executed until later, and because none of the use restrictions embedded in the original purchase contract interfered with the owner's

---

[6] Defendants did not argue in their opening brief that an owner occupying a unit lacked the authority to eject cleaning personnel, or that any such lack of authority deprived owners of a right to exclusive use. We decline to make that argument for them. See *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985) ("[M]atters on appeal that are not specifically and distinctly raised and argued in appellant's opening brief," "will not ordinarily [be] consider[ed].").

exclusive use of the property "on a recurring basis for a defined period of time," we conclude that Plaintiffs' units are "lots" and therefore subject to ILSA's disclosure requirements. 61 Fed. Reg. 13,602.

### B. The Improved Lot Exemption

Defendants argue that even if the condominiums are lots, the Improved Lot Exemption applies. The Improved Lot Exemption provides an exception to ILSA's disclosure provisions in cases involving "the sale or lease of any improved land on which there is a residential, commercial, condominium, or industrial building" or "the sale or lease of land under a contract obligating the seller or lessor to erect such a building thereon within a period of two years." 15 U.S.C. § 1702(a)(2). As the relevant contracts involved the sale of properties under construction, we must determine whether the purchase contracts "obligated" the seller to complete construction of the condominiums within two years, such that the promise to build was not at the discretion of the seller, or otherwise "illusory." *See Baroi v. Platinum Condo. Dev., LLC*, 874 F. Supp. 2d 980, 984 (D. Nev. 2012).

Defendants argue that this requirement was met because the purchase contracts provided estimated completion dates that occurred prior to December 2007. The purchase contracts were signed in May and December of 2006. The estimated completion dates for each of the relevant contracts therefore preceded the two-year deadline set by the Improved Lot Exemption. Defendants further highlight specific language in the purchase contracts, providing that "Seller shall use commercially reasonable efforts to complete the construction" by the estimated completion dates.

Importantly, however, the purchase contracts contained a pre-sale contingency clause that allowed the seller to terminate the contract "without liability" if less than 75% of the condominium units to be constructed were sold, or under contract to be sold, by the closing date. This provision therefore allowed Defendants to potentially rescind the agreements on the closing dates, which took place about one year after Plaintiffs signed the purchase contracts.

According to agency regulations, pre-sale contingency clauses are permissible under the Improved Lot Exemption, so long as they are operative for 180 days or less. *See* 12 C.F.R. § 1010.5. Specifically, HUD guidelines clarify that "[t]he presale period cannot exceed 180 days from the date the first purchaser signs a contract in the project." 61 Fed. Reg. 13,603.

The agency's interpretation of the statute is reasonable, as it allows sellers a modest period in which to make a final business determination on whether to construct the property, rather than automatically subject all sellers to ILSA's disclosure regime. Under these circumstances, the agency reasonably determined that the use of a limited pre-sale contingency clause would not render the seller's commitment to construct illusory. Because the regulations promulgated by HUD are a reasonable interpretation of an ambiguous provision in a statute HUD is charged with administering, we accord it *Chevron* deference on review. *See Chevron*, 467 U.S. at 843. Furthermore, the agency's interpretive guidelines, setting the beginning of the pre-sale period as the date of contract signing, are consistent with the timeframes adopted in the rest of the statute, *cf.* 15 U.S.C. § 1711 (a)(1), and serve as persuasive guidance under *Skidmore*. *See Skidmore*, 323 U.S. at 140.

Here, the relevant pre-sale contingency clause does not limit the cancellation period to 180 days after the signing of the contract, as required by 12 C.F.R. § 1010.5. Defendants argue, however, that they never had reason to exercise the pre-sale contingency clause after this period because the condominium units were nearly all under contract by December 2006. Nonetheless, we analyze the rights Defendants possessed at the time of the signing of the contracts to determine whether the terms of the contract obligated construction of the properties within two years, pursuant to 15 U.S.C. § 1702(a)(2). The purchase contract contained a pre-sale contingency clause that could be invoked at the time of the closing if 75% or more of the units remained unsold. Therefore, by its terms, the contract failed to limit the pre-sale contingency period to 180 days or less, as provided by agency regulation. 12 C.F.R. § 1010.5.

Accordingly, the Improved Lot Exemption does not extinguish Plaintiffs' claims because the pre-sale contingency clause is not limited to a period of 180 days or less and the purchase contracts do not obligate the seller to complete construction within two years pursuant to 15 U.S.C. § 1702(a)(2).

## III.    The 2014 Amendment

In September of 2014, during the pendency of the district court proceedings, Congress passed an amendment to ILSA, exempting condominium sales from ILSA's disclosure requirements, but allowing condominiums to remain subject to ILSA's fraud provisions. *See* Pub. L. No. 113-167, 128 Stat. 1882. The 2014 Amendment, codified at 15 U.S.C. § 1702(b)(9), did not purport to amend the definition of a "lot," as that word is used throughout the statute. Instead, it

created a statutory carve-out by including "the sale or lease of any improved land on which there is a . . . condominium" or "the sale or lease of land under a contract obligating . . . [the construction of] such a building thereon within a period of two years" among a list of exemptions to ILSA's disclosure provisions. 15 U.S.C. § 1702(a)(2).

ILSA was designed to regulate unfair practices in the sale of unimproved parcels of land. *See Winter*, 777 F.2d 1446–47. It offers procedural safeguards, including pre-sale disclosures, to protect buyers against unscrupulous developers and their agents. The term "lot," as it is used in the statute, has come to include condominiums. *See id.* at 1447. As discussed earlier, *supra* Section II.A, this reading is the product of a longstanding interpretation of ILSA adopted for decades by the governing agencies and by the courts. *See* 38 Fed. Reg. 23,866. We regard this agency interpretation of the word "lot" as a reasonable one and subject to *Chevron* deference on review.

The Eleventh Circuit reached the same result in *Winter*, finding the agency's definition of the word "lot" to be "the only defensible interpretation given subsequent events." *Winter*, 777 F.2d at 1448. The court went on to state that:

> It is reasonable to conclude, as HUD did, that the term "lot" was used to refer generally to interests in realty. The legislative history supports this construction, employing the terms "lot," "land," and "real estate" in discussing the Act. This construction is also reasonable in terms of the purpose of the statute. A fraudulent out-of-state sale of land

is not rendered any less fraudulent if the condominium form of ownership is utilized.

*Id*.

Moreover, a second clue that ILSA's protections extended to condominiums is the specific mention of "condominiums" in the Improved Lot Exemption, 15 U.S.C. § 1702(b)(9), which was added in 1978. *See id*. at 1447 n.7. As the *Winter* court reasoned, the fact that Congress specifically listed "condominiums" as among those types of improved lots that may be exempt from ILSA's disclosure requirements strongly implies that Congress had envisioned condominiums to be within the original scope of the statute. *Id.* at 1448–49. Otherwise, the use of such language in the exemption would be superfluous. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 536 (2004).

Cumulatively, therefore, the text and interpretive history of the statute lead to the conclusion that the agency's interpretation of "lot" is reasonable and entitled to deference under *Chevron*. *See Berlin*, 723 F.3d at 126–27.

### A.  A Substantive Change Rather than a Clarification of the Law

Despite this legislative history, Defendants claim that the 2014 Amendment, exempting condominiums from ILSA's disclosure provisions, should apply to the present action, which was commenced in 2011. If this were true, Plaintiffs' UCL claim would fail as a matter of law. The retroactive application of a new law to events that transpired prior to its passage requires that we conduct an analysis under *Landgraf* to ensure that such application reflects longstanding

principles of fairness and respect for the parties' settled expectations of the law. *Landgraf v. USI Film Prods.*, 511 U.S 244, 265 (1994).

However, no *Landgraf* analysis is required if an amendment merely serves to clarify rather than change the substance of existing law. *See ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689–90 (9th Cir. 2000). Defendants argue that the 2014 Amendment is a clarification of the original meaning of the statute, and not a substantive change in the law. Defendants cite to *Beverly Community Hospital Association v. Belshe*, 132 F.3d 1259 (9th Cir. 1997), for the proposition that Congress acts to clarify the meaning of the law when courts have found "extraordinary difficulty . . . in divining the intent of the original Congress." *Id*. at 1266. Yet this is not the case here, as the agency's interpretation of "lot" prevailed for decades and was readily adopted by both courts and policymakers during this interval. *See supra* Section II.A.

Defendants also emphasize remarks made by the bill's sponsor, Representative Carolyn Maloney, and other members of Congress prior to a vote in the House of Representatives. While we place little value on the statements of individual legislators in connection with the enactment of a bill, we nevertheless consider them in our analysis. *See Brock v. Pierce Cty.*, 476 U.S. 253, 263 (1986) ("[S]tatements by individual legislators should not be given controlling effect, but when they are consistent with the statutory language and other legislative history, they provide evidence of Congress' intent.").

Representative Maloney declared that the 2014 Amendment was meant to provide a "technical fix" for condominium sales. 159 Cong. Rec. H5822 (daily ed. Sept.

25, 2013) (statement of Rep. Maloney). Other legislators claimed that the amendment would help align the statute to its intended purposes, as some of ILSA's disclosure requirements did not make sense when applied to condominium properties, but instead permitted owners suffering from "buyer's remorse" to rescind their purchase agreements after the properties plummeted in value during the economic recession. *Id*. at H5822 (statement of Rep. McHenry). As Representative Maloney noted, "during the economic downturn in 2008, some buyers used the recording requirements of ILSA to rescind otherwise valid contracts for economic reasons, an unintended consequence of the act and its intent." *Id.* at H5822. Echoing the title of the act, one legislator stated that the bill provides a "commonsense clarification to [ILSA] to preserve consumer protections while keeping our economic recovery on track." *Id.* at H5822 (statement of Rep. Nadler).

Considered in the light of recent events, the 2014 Amendment serves to address a new issue that arose concerning the proper scope of ILSA disclosure. As one legislator acknowledged, "ILSA was rarely an issue in private condo sales until the economy collapsed in 2008." *Id*. at H5823 (statement of Rep. Nadler). Subsequent changes in the economic and business landscape following the recession and real estate market crash of the late 2000s led purchasers to engage in overzealous use of ILSA's disclosure provisions to cure cases of condominium buyer's remorse. A change in the law was therefore required to address the new realities of the real estate market and to tailor ILSA's scope to "the unique conditions under which these units are sold in today's market." *Id*. at H5822 (statement of Rep. Maloney).

Because the bill passed unanimously in both houses without debate, such remarks constitute the "legislative history" of the 2014 Amendment, such as it is. Post-hoc labeling as a "clarification" by bill supporters of what otherwise appears to be a change, however, is not controlling given the long interpretative history of the statute. Defendants' heavy reliance on the title of the 2014 Amendment, "An act to amend the Interstate Land Sales Full Disclosure Act to clarify how the Act applies to condominiums," is similarly misplaced. Although the title notes that this is a clarification, the lapse between the enactment of the bill and the bill's effective date (180 days), coupled with the bill's silence on the issue of retroactivity, suggests that this was actually a change in the law. *See Logan v. U.S. Bank Nat'l Ass'n*, 722 F.3d 1163, 1172 (9th Cir. 2013) ("Though a statute's title 'can be used to resolve[] ambiguity,' it 'cannot control the plain meaning of a statute.'" (quoting *Or. Pub. Util. Comm'n v. Interstate Commerce Comm'n*, 979 F.2d 778, 780 (9th Cir. 1992)).

In the present case, Congress appears to have adopted a substantive change in the law by discarding an old application that no longer served ILSA's purposes, or that was outweighed by considerations arising from changed circumstances. This reading of the 2014 Amendment is borne out by the text and interpretive history of the statute. Congress' decision to "legislatively overrule" earlier interpretations of a statute does not necessarily imply that these earlier interpretations were inconsistent with congressional intent at the time or even "wrongly decided." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 304–05 (1994). Rather, "[a]ltering statutory definitions, or adding new definitions of terms previously undefined, is a common

way of amending statutes" so that Congress can refine and sharpen old statutory meanings. *Id*. at 308.

## B.  The *Landgraf* Analysis

Since the amendment is a substantive change in law, and not just a clarification of existing law, we must determine whether its application to the present case is proper under *Landgraf. Landgraf* provides a framework for deciding when the retroactive application of the law is warranted and when, conversely, it would violate principles of "fairness dictat[ing] that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." 511 U.S. at 265. "[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. . . . In a free, dynamic society, creativity in both commercial and artistic endeavors is fostered by a rule of law that gives people confidence about the legal consequences of their actions." *Id*. at 256–66.

The first step in the *Landgraf* analysis is a determination of whether the statute contains an express statement on its proper temporal reach. *Id.* at 280. The district court correctly found that no such pronouncement is contained in the bill itself. Indeed, the 180-day delay in the bill's effective date suggests that the amendment ought to be applied prospectively, so that actors may adjust their behavior to conform to the new legislation. *See Fitzgerald v. Century Park, Inc.*, 642 F.2d 356, 359 (9th Cir. 1981).

Second, when the law contains no "express command" concerning its temporal scope, we must examine whether its application would have a retroactive effect in this case.

*Landgraf*, 511 U.S. at 280. Retroactive effect, in this context, refers to an application that would "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id*. Here, the 2014 Amendment would have retroactive effect because it would extinguish Defendants' liability under ILSA, and by extension the UCL, thus depriving Plaintiffs of a pre-existing cause of action. In *TwoRivers v. Lewis*, 174 F.3d 987 (9th Cir. 1999), we held that the application of a new amendment to shorten the statute of limitations would "deprive [Plaintiff] of his right to file suit" by "foreclosing a cause of action which existed prior to the amendment." *Id*. at 995. Similarly, in *Scott v. Boos*, 215 F.3d 940 (9th Cir. 2000), we concluded that a statute had retroactive effect when "the intent was substantive—to deprive plaintiffs of the right to bring securities fraud based RICO claims." *Id*. at 945. There, we noted that such an effect would "impair[] rights a party once possessed." *Id*. at 946.

Defendants' argument that Plaintiffs' rights are not subject to *Landgraf* because those rights have not vested is unavailing. In *Scott*, we rejected a similar argument, stating that "[t]his reading of the *Landgraf* test is misleading." *Id*. at 947. We instead held that the *Landgraf* Court did not restrict its analysis of "rights a party possessed" to "vested rights" only. *Id.* If applied to the present case, the 2014 Amendment would impair Plaintiffs' right to bring suit—a right that Plaintiffs possessed and exercised prior to the amendment's passage—which is enough to show the Amendment would

have retroactive effect within the meaning of *Landgraf* whether or not this qualifies the rights as "vested."**[7]**

If a statute is determined to have retroactive effect, we proceed to the final step of the *Landgraf* analysis and assess whether "clear congressional intent" nonetheless counsels in favor of retroactive application. *See Landgraf*, 511 U.S. at 280. We employ a presumption that Congress did not intend for legislation to operate retroactively. *Id.* This presumption has particular weight in the circumstances of the present case, which concerns "contractual or property rights, matters in which predictability and stability are of prime importance." *Id*. at 271.

As we determined earlier, there is no clear congressional intent to have the 2014 Amendment apply retroactively to events prior to its passage. *See supra* Section III.B. The *Landgraf* Court concluded that "[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Id*. at 257. Neither are the title of the statute, or the statements of its supporters, adequate to conclude that Congress specifically intended to reach prior conduct, or that it "affirmatively considered the potential unfairness of retroactive application and determined that it is

---

**[7]** Defendants also cite to *Lyon v. Augusta, S.P.A.*, 252 F.3d 1078 (9th Cir. 2001), for the proposition that retroactive application would not impair Plaintiffs' rights under *Landgraf* because a "property right in any cause of action does not vest until a final *unreviewable* judgment." *Id*. at 1086 (quoting *Grimesy v. Huff*, 876 F.2d 738, 743–44 (9th Cir. 1989)). The *Lyon* Court's statement, however, was made in the context of a substantive due process analysis, conducted to determine whether the plaintiffs had been "deprived of a vested property right in their cause of action." *Id.*

an acceptable price to pay for the countervailing benefits." *Id.* at 272–73. In light of the lengthy interpretative history of the statute and the use of the 180-day effective date provision, we hold that Congress did not express a clear intent that the 2014 Amendment operate retroactively to deprive Plaintiffs of a pre-existing cause of action.

Accordingly, ILSA's disclosure requirements apply to the condominium units purchased by Plaintiffs. Since Defendants concede that they have failed to comply with those disclosure requirements, the district court properly granted summary judgment to Plaintiffs on their UCL claim.

## CONCLUSION

The district court's grant of partial summary judgment is **AFFIRMED** with respect to those issues certified for interlocutory appeal.[8]

---

[8] We express no opinion, however, as to whether the district court properly included all Defendants within the scope of its partial summary judgment order. *See supra* n.2.